THE RICHARDS GROUP OF PUERTO RICO, INC., recurrente y peticionaria, *v.* JUNTA DE PLANIFICACIÓN DE PUERTO RICO, recurrida.

*Número:* O-78-83          *Resuelto:* 15 de noviembre de 1978

---

*O'Neill & Borges, Leonardo Andrade Lugo* y *Raúl E. González Díaz,* abogados de la peticionaria; *Héctor A. Colón Cruz, Procurador General;* y *Justo Gorbea Varona, Procurador General Auxiliar,* abogados de la recurrida.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

Luego de diversos trámites, la Junta de Planificación aprobó el plano de construcción de la Urbanización Los Dominicos en terrenos localizados dentro de la zona circundada por la Carretera Periferal, establecida como límite para el crecimiento urbano del Area Metropolitana de San Juan. Esta aprobación fue condicionada al cumplimiento por la peticionaria, The Richards Group of Puerto Rico, Inc., de la condición siguiente, entre otras:

"Conforme al Desarrollo Preliminar aprobado se requiere la provisión de obras de urbanización en la Avenida Los Dominicos. Los planos sometidos no incluyen las referidas obras. La Junta en reunión celebrada el 23 de mayo de 1973, acordó requerir facilidades equivalentes a una calle principal de 20.60 metros, dividida en dos secciones de 10.30 metros. Se proveerán aceras de 1.50 metros, faja de seguridad de 2.50 metros y un rodaje de 6.30 metros. La misma deberá incluir alumbrado público y las correspondientes obras pluviales.

Se DISPONE a los efectos antes indicados que conforme a lo antes requerido deberán someterse a la condición de la Junta, planos de construcción enmendados que muestren las obras y detalles de la construcción de las calles requeridas."

La urbanizadora objetó ante la Junta el requerimiento de construcción de una calle principal en los terrenos por los cuales se proyectaba que transcurriese la Avenida Los Dominicos. Conforme el Plan de Transportación 1999 para el Área Metropolitana de San Juan, la Avenida Los Dominicos arranca de la Autopista Periferal, atraviesa en dos la urbanización Los Dominicos, cruza las extensiones proyectadas de las autopistas 65 de Infantería y De Diego y termina en Levittown. La Junta resolvió eximir a la peticionaria del referido requisito de construcción, mas únicamente a cambio de que esta transfiriese "en su totalidad, para uso público, la servidumbre de 36.00 metros de ancho a todo lo largo de la propuesta avenida, en el proyecto." La Junta no celebró vista para dilucidar las repetidas objeciones de la peticionaria.

La peticionaria acudió entonces al Tribunal Superior para revisar la resolución de la Junta. El tribunal sostuvo la decisión administrativa. En alzada ante nos la peticionaria plantea esencialmente, como lo hizo en primera instancia, que la Junta no tiene autoridad en ley para requerir la transferencia gratuita de terrenos como condición para aprobar la lotificación de unos terrenos y que, de tenerla, la actuación de la Junta representa una confiscación de la propiedad sin que medie el pago de justa compensación.

1. *La autoridad de la Junta de Planificación para requerir las condiciones impugnadas.*

La controversia en este caso quedó trabada antes de la aprobación de la Ley Orgánica de la Administración de Reglamentos y Permisos, Ley Núm. 76 de 24 de junio de 1975, 23 L.P.R.A. sec. 71 *et seq.* y de la nueva Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley Núm. 75 de 24 de junio de 1975, 23 L.P.R.A. sec. 62 *et seq.* Debemos en consecuencia examinar el esquema estatutario anterior. 23 L.P.R.A. sec. 63h(b) y (c).

La antigua Ley de Planificación y Presupuesto, Ley Núm. 213 de 12 de mayo de 1942, según enmendada, 23 L.P.R.A. sec. 1 *et seq.*, obedecía a un propósito muy amplio y abarcador:

"Los poderes concedidos en las secs. 1 a 30 y 81 a 86 de este título se ejercerán con el propósito general de guiar el desarrollo de Puerto Rico de modo coordinado, adecuado y económico, el cual, de acuerdo con las actuales y futuras necesidades y los recursos humanos, físicos y económicos, hubiere de fomentar en la mejor forma la salud, la seguridad, la moral, el orden, la conveniencia, la prosperidad, la defensa, la cultura, la solidez económica y el bienestar general de los actuales y futuros habitantes, y aquella eficiencia y economía en el proceso de desarrollo, en la distribución de población, en el uso de las tierras y en las mejoras públicas que tiendan a crear condiciones favorables a tales fines." 23 L.P.R.A. sec. 3.

Más adelante se dispuso:

"La Junta adoptará, entre otros, los siguientes reglamentos para implementar las recomendaciones del Plano Regulador de Puerto Rico, o de sus partes:

.  .  .  .  .  .  .  .

(3) Para regir la lotificación de terrenos en Puerto Rico. Este reglamento podrá incluir en sus disposiciones aquellas que se refieran a las formas de desarrollo propuesto y uso de terrenos adyacentes a base del Plano Regulador de calles, luz, aire y densidad de población, agua, avenamiento e instalaciones sanitarias,

tamaño y forma de solares; reservas obligatorias de un área mínima para dedicar a escuelas, bibliotecas o salones de lectura, centros culturales, parques, usos comerciales, iglesias y cualquier otro uso público o privado necesario al desarrollo de la comunidad; . . . .

Al adoptar disposiciones reglamentarias y considerar subdivisiones de terreno, la Junta se guiará por la conveniencia de evitar subdivisiones en áreas que no estén listas para tales desarrollos debido a la falta de instalaciones tales como calles o carreteras con capacidad adecuada, agua, luz y alcantarillado, a la distancia de otras áreas construidas para evitar desarrollos aislados y estimular por el contrario desarrollos compactos, a la importancia agrícola o de excepcional belleza de los terrenos por la susceptibilidad a inundaciones de los terrenos, u otras deficiencias sociales, económicas y físicas análogas." 23 L.P.R.A. sec. 9 (Supl. 1975).

El Art. 40 del Reglamento de Lotificación aprobado en virtud de las disposiciones citadas, 23 R.&R.P.R. sec. 10-162, proveyó específicamente:

"Artículo 40. *Derechos de vía*

"(a) El derecho de vía de una vía pública se tomará como la distancia más corta entre las líneas que delimitan todo el espacio dedicado a uso público en esa vía pública. El derecho de vía se transferirá o se reservará por el urbanizador según lo exija la Junta y a tal efecto se establecen los siguientes anchos mínimos:

. . . . . . . .

"(2) Para las avenidas, no menos de 33 metros, de los cuales se transferirán 19 metros, esto es, 9.50 metros a cada lado de éstas, correspondientes a una línea de tránsito y una línea de estacionamiento de vehículos a cada lado, además del espacio a ser dedicado a acera y a siembra de árboles, y se reservará la diferencia."

■ Conforme el artículo citado del Reglamento de Lotificación la Junta tenía autoridad específica para requerir la transferencia de 19 metros del derecho de vía de la Avenida Los Dominicos y la reserva del espacio restante. No puede decirse que la concesión por reglamento de esta autoridad está

reñida con la ancha función que la ley le encomendaba a la Junta de "guiar el desarrollo de Puerto Rico de modo coordinado, adecuado y económico", así como de "fomentar en la mejor forma . . . el bienestar general de los actuales y futuros habitantes, y aquella eficiencia y economía en el proceso de desarrollo . . . en el uso de las tierras y en las mejoras públicas que tiendan a crear condiciones favorables a tales fines." 23 L.P.R.A. sec. 3. Este lenguaje le concede también a la Junta un margen de discreción suficiente para exigir la construcción de mejoras en casos adecuados. El Art. 20A de la vieja ley, 23 L.P.R.A. sec. 21, requería la trasmisión por el Gobernador a la Asamblea Legislativa, para su aprobación, modificación o rechazo, de los reglamentos adoptados por la Junta. Ni el Art. 40 del Reglamento de Lotificación ni las disposiciones de que deriva su autoridad han sido enmendados por la Asamblea Legislativa en parte pertinente. En *Seashore Realty, Etc., Co.* v. *Junta de Planificación*, 75 D.P.R. 142, 151–152, 156 (1953), este Tribunal aceptó la validez del Art. 40 del referido Reglamento y halló apoyo en el citado Art. 3 de la ley para sostener los requisitos impuestos por la Junta para que un urbanizador construyese gratuitamente sobre su propiedad privada aceras de 1.50 m. de ancho a una distancia de 3 m. del borde de una vía pública, que construyese también el encintado de dicha carretera y que en el espacio entre el encintado y el borde exterior de la acera proveyese una faja para arboleda de 2 m. de ancho. (1)

---

(1) En *Zayas* v. *Junta de Planificación*, 69 D.P.R. 30 (1948), se resolvió que la Junta no estaba autorizada para requerirle a un urbanizador la transferencia gratuita de cierta área para usos recreativos. En adición a las diferencias con los hechos de este caso, en que se reglamenta específicamente la materia referente a las vías públicas, *Zayas* perdió vigencia al aprobarse la Ley Núm. 25 de 8 de junio de 1962, 23 L.P.R.A. secs. 30a–30g, la cual proveyó la autoridad que el Tribunal estimaba que faltaba. Véanse: Negrón García, *La Planificación Urbana en Puerto Rico y el Debido Proceso de Ley*, 36 Rev. Jur. U.P.R. 63, 76–77 (1967); Cordero, *Operación Metro: A Case Study of the Power Structure in Action and the Crisis in the Planning Process in Puerto Rico*, 32 Rev. Jur. U.P.R. 353, 374–375 (1963).

El Art. 5 (*l*) de la Ley Orgánica de la Administración de Reglamentos y Permisos, 23 L.P.R.A. sec. 71d (*l*), arroja luz adicional sobre el problema que nos ocupa. Se faculta en él a la Administración a:

"(*l*) Requerir y aceptar regalías, donaciones o aportaciones de dinero o de otra naturaleza, para que se provean facilidades u otras obras, para el desarrollo y uso más adecuado de los terrenos y autorizará el traspaso de las mismas al organismo gubernamental del Gobierno del Estado Libre Asociado de Puerto Rico concernido con dichas facilidades u obras."

Del historial legislativo de esta medida y su compañera, la Ley Orgánica de la Junta de Planificación, no se desprende intención alguna de conferir mediante el lenguaje transcrito ningún poder que no poseyese la Junta. Revela este historial, por el contrario, que "El objetivo básico de ARPE (la Administración de Reglamentos y Permisos) será ocuparse de las funciones operacionales que al presente desempeña la Junta de Planificación y velar por el cumplimiento de las leyes y reglamentos de planificación, permitiendo a la Junta de Planificación dedicar todos sus esfuerzos y recursos a la función integral de integrar y coordinar la formulación e implementación de las políticas y estrategias de desarrollo físico, económico y social de Puerto Rico." (²) Se señala expresamente en el historial que ARPE aplicará los reglamentos hasta entonces adoptados o que aprobase luego la Junta. (³) En lo que concierne a la Junta, se indica que la intención fue asignarle las facultades que le reconocía la antigua legislación "en la fase normativa y de política pública." "Las funciones actuales que descarga la Junta en torno a la aplicación de los reglamentos en casos individuales y la concesión de permisos de construcción", se apuntó, "se asignan a la Adminis-

---

(²) Informe de las Comisiones de Gobierno y Desarrollo Socioeconómico del Senado sobre el P. del S. 1076, 21 de marzo de 1975, pág. 1, mecanografiado, archivo de Secretaría del Senado.

(³) *Ibid.*, 3.

tración de Reglamentos y Permisos (ARPE), cuya creación se propone a esta misma legislatura mediante el P. del S. 1076." (⁴) Lo que las mencionadas leyes de 1975 persiguieron en esencia, según reafirmó el Presidente de la Junta en las vistas públicas celebradas, fue una reforma de índole administrativa. (⁵)

Si se compara, por último, nuestro esquema estatutario y reglamentario con el de varias otras jurisdicciones se advertirá que bajo disposiciones similares, o en ocasiones aun menos específicas que las nuestras, los tribunales han considerado que existe poder en el organismo administrativo para imponer condiciones análogas a las exigidas aquí. *Ayres* v. *City Council of City of Los Angeles*, 207 P.2d 1 (Cal. 1949) ; *Jordan* v. *Village of Menomonee Falls*, 137 N.W.2d 442 (Wis. 1965) ; *City of Bellefontaine Neighbors* v. *J. J. Kelley Realty & Building Co.*, 460 S.W.2d 298 (Mo. App. 1970) ; *Frank Ansuini, Inc.* v. *City of Cranston*, 264 A.2d 910 (R.I. 1970) ; *Aunt Hack Ridge Estates, Inc.* v. *Planning Commission*, 273 A.2d 880 (Conn. 1970).

(⁴) Informe de las Comisiones de Gobierno y Desarrollo Socioeconómico del Senado sobre el P. del S. 1075, 21 de marzo de 1975, pág. 2, mecanografiado, archivo de Secretaría del Senado.

(⁵) Comparecencia del señor Rafael Alonso a la vista celebrada conjuntamente el 23 de enero de 1975 ante las Comisiones de Gobierno, Hacienda y Desarrollo Socioeconómico del Senado, mimeo, *passim*. Por su parte, el ex-presidente de la Junta, doctor Rafael Picó, declaró en su comparecencia de 4 de febrero de 1975:

"[T]odo esto concerniente a los permisos de urbanismo, o de obras públicas se lo traspasa a un nuevo organismo, para que éste pueda funcionar aparte de la Junta, pero poniendo en vigor los reglamentos de la Junta. Lo mismo que hacen ahora, en la Junta, una serie de divisiones . . . Y entonces los planificadores, los miembros de la Junta que debían estar dedicando su tiempo y sus esfuerzos a algo más provechoso que resolver los casitos individuales, pueden delegar esa función, como aquí se propone, a un organismo que bregue con eso. De ahí, pues se va a la Junta de Apelaciones. Y de ahí a las cortes. Pero la Junta de Planificación puede concentrar en los instrumentos que retiene, que son los de la verdadera planificación integral." Transcripción de la ponencia del doctor Picó, págs. 10-2 a 10-3.

Resolvemos, por tanto, que la Junta de Planificación de Puerto Rico estaba facultada bajo la legislación anterior a la actual para imponer las condiciones impugnadas, aunque no para exigir, por impedirlo el Art. 40(a)(2) del Reglamento de Lotificación, que se transfieran gratuitamente por la urbanizadora más de 19 metros. Esta conclusión nos obliga a considerar entonces el segundo planteamiento formulado: el ataque a la constitucionalidad de la facultad conferida a la Junta para imponer las referidas condiciones.

2. *La constitucionalidad del poder concedido a la Junta para imponer los requisitos cuestionados.*

Este planteamiento encierra dos problemas. Hay que determinar aquí no sólo si el poder concedido a la Junta, según descrito en la sección que antecede, es constitucional sino también si su ejercicio en este caso es conforme a la ley fundamental del país.

■ Los asuntos que este litigio entraña suscitan cuestiones básicas sobre la naturaleza del poder de expropiación forzosa, su conexión con el poder de razón de estado (*police power*) y aun sobre el concepto mismo de la propiedad.

■ La Sec. 9 del Art. II de la Constitución del Estado Libre Asociado([6]) provee:

"No se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley."

Esta cláusula superficialmente simple está erizada de interrogantes. Las que nos conciernen para fines de este pleito son pocas, pero críticas. ¿Qué significa la propiedad privada den-

---

([6]) Se funda esta cláusula en la parte de la Enmienda Quinta a la Constitución de Estados Unidos, que dispone en su versión original: ". . . nor shall private property be taken for public use, without just compensation."

tro de nuestro sistema de gobierno? ¿Qué derechos acarrea y en qué circunstancias? ¿Qué es lo que constituye "tomar" o "perjudicar" la propiedad privada? ¿Cuál es la línea divisoria entre el poder de expropiación y el de razón de estado? Las contestaciones a estas preguntas deben por fuerza estar atadas a la situación de hechos que cada caso presente.

    El concepto "propiedad" no posee un contenido estático. Representa una idea que históricamente se ha distinguido por su extraordinaria fluidez. Sax, *Takings and the Police Power*, 74 Yale L.J. 36, 61 (1964); Philbrick, *Changing Conceptions of Property in Law*, 86 U. Pa. L. Rev. 691, 696 (1938). Contrario a lo que comúnmente se supone, la cláusula sobre la expropiación forzosa de la constitución estadounidense no se incluyó en ella como dique contra la redistribución de la riqueza. [7] Los principales pensadores de los siglos diecisiete y dieciocho que proveyeron la matriz ideológica de este documento consideraban que la tarea primordial del gobierno consistía en regular el poder económico para hacerles la vida agradable y placentera a todos los miembros de la sociedad. Siglos antes, en la Edad Media, la noción de la propiedad privada estaba aún más subordinada al logro de la justicia social. Sax, *supra*, 53–55. Fue mucho más tarde, en el siglo anterior y en el nuestro, que sobrevinieron los tiempos del *laissez faire*, cuya herencia no se ha disipado enteramente, y en que se concibió la propiedad como un haz de derechos inmutables, prácticamente inmunes al poder del Estado. Desde hace varias décadas esta visión absolutista y petrificada de la propiedad ha venido cediendo. Reich, *The New Property*, 73 Yale

---

[7] El contenido de esta cláusula ha variado considerablemente a través de los años. Estudios de la materia indican que el objetivo original de la cláusula era atender las situaciones en que en conflictos bélicos las fuerzas armadas se veían obligadas a incautarse de los hogares y otras pertenencias de los ciudadanos o a destruirlos para evitar que cayeran en manos del enemigo. Sax, *supra*, 56–57.

L.J. 733 (1964). Hoy podemos decir que la propiedad en las sociedades democráticas tradicionales entraña determinados derechos, pero que estos viven en competencia continua con otros intereses, privados y públicos, de importancia cambiante y en ocasiones creciente. La extensión de esos derechos y el grado a que tienen que ceder ante otros valores dependen de las circunstancias de cada controversia. (⁸)

En la situación que nos ocupa resulta claro en nuestra jurisdicción que el derecho de propiedad no abarca el derecho de urbanizar un predio sin autorización gubernamental, la cual puede condicionarse. *Segarra* v. *Junta de Planificación*, 71 D.P.R. 150 (1950); *Waymouth Corp.* v. *Junta de Planificación*, 80 D.P.R. 619 (1958); *Heftler International, Inc.* v. *Junta de Planificación*, 99 D.P.R. 467 (1970); *Vda. de Iturregui* v. *E.L.A.*, 99 D.P.R. 488 (1970); *Flamboyán Gardens* v. *Junta de Planificación*, 103 D.P.R. 884 (1975). Esta doctrina altera la visión tradicional vigente hasta hace relativamente corto tiempo en muchas jurisdicciones sobre la facultad casi inviolable de desarrollar terrenos. Cunningham & Kremer, *Vested Rights, Estoppel, and the Land Development Process*, 29 Hastings L.J. 625, 639 (1978); F. Bosselman, D. Callies & J. Banta, *The Taking Issue: A Study of the Constitutional Limits*, Council on Environmental Quality,

---

(⁸) Hace casi 30 años el entonces Juez Presidente de este Tribunal, Don Angel R. de Jesús, afirmó en *Rivera* v. *R. Cobián Chinea & Co.*, 69 D.P.R. 672, 676 (1949):

". . . no debemos perder de vista que el concepto moderno del derecho de propiedad dista mucho del que conocieron los autores de la Constitución. Hoy nadie califica de 'sagrado' el derecho a la propiedad como ocurría frecuentemente en el pasado siglo. Hoy la propiedad tiene una función social que es la de servir a la sociedad y no exclusivamente a su dueño. Como muy bien dice la apelada en su alegato: 'El nuevo concepto de la propiedad señala a ésta una función eminentemente social, que está tan lejana de aquella cerrada definición del Derecho Romano, que definía la propiedad como "el derecho de usar y de abusar de las cosas, tanto como lo permita la razón del derecho". En el nuevo concepto el privilegio individual queda supeditado al interés social'."

1973, pág. 323. Queda por resolver lo más difícil: la naturaleza de los requisitos que pueden imponerse como condición para urbanizar un terreno. ¿Cuándo es que un requisito representa el ejercicio legítimo del poder de razón de estado y cuándo es que representa una incautación compensable bajo la cláusula de expropiación forzosa?

Impera sobre este particular total confusión en la jurisprudencia y la doctrina. Si en algo existe casi unanimidad de opinión es en que el criterio determinante de la demarcación entre el poder de expropiación forzosa y el de razón de estado no ha sido descubierto todavía. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv. L. Rev. 1165, 1167–1169 (1967); Sax, *Takings and the Police Power*, 74 Yale L.J. 36, 37 (1964); Dunham, *Griggs v. Allegheny County in Perspective: Thirty Years of Supreme Court Expropiation Law*, 1962 Sup. Ct. Rev. 63; B. A. Ackerman, *Private Property and the Constitution*, New Haven, Yale University Press, 1977, pág. 168; Van Alstyne, *Taking or Damaging by Police Power: The Search for Inverse Condemnation Criteria*, 44 So. Cal. L. Rev. 1, 2 (1971); Johnson, *A Discussion of Land Regulation without Compensation*, en B. H. Siegan, ed., *Planning Without Prices—The Taking Clause as It Relates to Land Regulation Without Compensation*, Lexington, Mass., 1977, pág. 71

La ausencia de un criterio determinante reconocido generalmente no se debe a escasez de teorías sobre su supuesta identidad. El Tribunal Supremo de Estados Unidos ha desarrollado básicamente dos, ambas fundadas en antiguos conceptos sobre la propiedad; productos de otras realidades económicas. El padre de la primera fue el primer Juez Harlan. Bajo su teoría, si el Estado invadía físicamente un bien para invocar un interés propietario, el acto constituía una incautación compensable. Si la intervención del Estado obedecía, en cambio, al propósito de eliminar el uso nocivo de la propiedad afectada se trataba de un uso legítimo del poder de razón de

estado y no procedía el pago de compensación alguna. Sax, *supra*, 39. El segundo enfoque fue expuesto por Holmes en *Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393, 413 (1922). Se le conoce como el criterio de la disminución del valor. Difiere del primer criterio en que no postula una diferencia cualitativa entre los dos poderes. El poder de razón de estado puede ejercerse hasta cierto punto. El punto puede variar de caso a caso. Si la acción estatal alcanza tal magnitud que disminuye irrazonablemente el valor de una propiedad, el poder de razón de estado se convierte en el de expropiación forzosa.

Ambos enfoques han sido objeto de crítica severa. Sax, *supra*, 46–60; Michelman, *supra*, 1226–34; Dunham, *supra*, *passim*. El propio Holmes no aplicó consistentemente su criterio. *Erie R.R. Co.* v. *Public Utility Commissioners*, 254 U.S. 394, 410 (1921). En varios casos importantes el Tribunal Supremo de Estados Unidos ha rehusado considerar el argumento de que la acción atacada causaría graves pérdidas económicas. *Village of Euclid* v. *Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (pérdida de 75% del valor) ; *Hadacheck* v. *Sebastian*, 239 U.S. 394, 405 (1915) (disminución en valor montante a 87 1/2%). Dicho tribunal no ha intentado después formular un nuevo criterio. Acostumbra decir que no existen reglas rígidas o una fórmula precisa para distinguir entre el poder de expropiación forzosa y el de razón de estado. *United States* v. *Caltex, Inc.*, 344 U.S. 149, 156 (1952) ; *Goldblatt* v. *Town of Hempstead*, 369 U.S. 590, 594 (1962) ; *Penn Central Transportation Company* v. *New York City*, 438 U.S. 104, 57 L.Ed.2d 631, 648 (1978).

Los comentaristas y otros tribunales, por su parte, han demostrado notable fecundidad en la producción de normas encaminadas a tal fin. Para mencionar unas pocas, por ejemplo, se han formulado: (1) la teoría del nexo racional entre la necesidad creada por la subdivisión y la condición im-

puesta; (2) la teoría que requiere que la exacción sea específica y únicamente atribuible a la lotificación; (3) la teoría del beneficio correlativo para la urbanización sujeta a la carga cuestionada; (4) la teoría del beneficio directo, que requiere que se cumpla con las teorías (2) y (3); (5) la teoría de la necesidad o del beneficio correlativo, que exige que se cumpla con la teoría (1) o la (3); y (6) la teoría de la relación sustancial razonable. Es innecesario analizarlas en detalle.(⁹) Ninguna ha alcanzado preeminencia.

Tan abundante cosecha de teorías ha generado, como es de esperarse, considerable controversia. Es extensa la gama de opiniones. Existen, en un extremo, los abanderados de los viejos derechos dominicales, quienes requerirían compensación en todo caso, excepto cuando la acción estatal se dirige a impedir o eliminar un estorbo público. Véanse: B. Siegan, *Land Use Without Zoning*, 1972; Ellickson, *Alternatives to Zoning: Covenants, Nuisance Rules, and Fines as Land Use Controls*, 40 U. Chi. L. Rev. 681, 781 (1973). Del otro lado abundan los entusiastas de la máxima

---

(⁹) Para su discusión a fondo y de los casos en que se han aplicado, véanse: Johnston, *Constitutionality of Subdivision Control Exactions: The Quest for a Rationale*, 52 Cornell L.Q. 871, 887–924 (1967); Heyman & Gilhool, *The Constitutionality of Imposing Increased Community Costs on New Suburban Residents through Subdivision Exactions*, 73 Yale L.J. 1119, 1122–1146 (1964); Note, *Forced Dedications in California*, 20 Hastings L.J. 735 (1969); Note, *Subdivision Exactions: Where is the Limit?*, 42 Notre Dame Law. 400 (1967); Comment, *Forced Dedications as a Condition to Subdivision Approval*, 9 San Diego L. Rev. 112 (1971); Note, *Subdivision Land Dedication: Objectives and Objections*, 27 Stan. L. Rev. 419 (1975); Note, *Subdivision Exactions in California: Expansion of Municipal Power*, 23 Hastings L.J. 403 (1972); Comment, *Subdivision Exactions: the Constitutional Issues, the Judicial Response, and the Pennsylvania Situation*, 19 Vill. L. Rev. 782 (1974); Note, *Mandatory Dedication of Land by Land Developers*, 26 U. Fla. L. Rev. 41 (1973); Dolbeare, *Mandatory Dedication of Public Sites as a Condition in the Subdivision Process in Virginia*, 9 U. Rich. L. Rev. 435 (1975); Fitzgerald, *The Regulation of Subdivisions*, 14 Wm. & Mary L. Rev. 249 (1972); Comment, *Taking Without Compensation through Compulsory Dedication—New Horizons for California Land Use Law*, 5 Loy. L.A. L. Rev. 218 (1972).

expansión del poder de razón de estado. Para algunos autores una reglamentación razonablemente relacionada con el ejercicio de una función pública válida no puede constituir bajo ninguna circunstancia imaginable una incautación. F. Bosselman, D. Callies & J. Banta, *The Taking Issue: A Study of the Constitutional Limits*, Council on Environmental Quality, 1973, pág. 238.

██ Consideramos que el caos en que se halla este sector del derecho se debe en buena parte a esta sed que a veces nos ataca a todos de hallar reglas sencillas y uniformes para situaciones altamente complejas y variables. Hay campos del derecho en que la simplicidad se alcanza tan solo a costa de la justicia; en que el proceso de decisión es por necesidad penoso y complicado.

██ Estimamos que tal es la situación presente. Nos hallamos ante otra instancia más en que tienen que sopesarse, caso a caso, los valores envueltos. Hay que identificar abiertamente esos valores y las realidades en que se basan, precisar su jerarquía, situación a situación, para lograr un equilibrio razonable para el tiempo que vivimos entre los actos gubernamentales que exigen compensación en circunstancias como las que nos ocupan y los que no la exigen. Véanse: J. J. Costonis, C. J. Berger & S. Scott, *Regulation v. Compensation in Land Use Control*, U. of Cal., Berkeley, 1977, pág. 90 y ss.; *Penn Central Transportation Company* v. *New York City, supra*. Enumeremos los factores principales que deben considerarse en nuestra jurisdicción en situaciones como la presente.

Primero, debe tenerse muy en cuenta el papel que juega la tierra en nuestra economía. En *E.L.A.* v. *Rodríguez*, 103 D.P.R. 636, 642 (1975), al resolver que la pérdida total de acceso de un predio a una vía pública requiere compensación, pero no otras limitaciones al acceso, expresamos:

"En la consideración del problema no puede soslayarse que la tierra en Puerto Rico es un recurso natural escaso y de continuo incremento en valor, resultado natural del aumento poblacional y el desarrollo industrial. Torres Rigual: *Control of Land Value Through Taxation,* 23 Rev. C. Abo. P.R. 419. Tampoco se puede esquivar la realidad de que los recursos fiscales no son ilimitados y sería en extremo gravoso para el fisco extender el derecho de acceso más allá de lo razonable . . . ."

Nuestro reducido espacio, junto a la situación precaria de nuestra economía, constituyen realidades que necesariamente pesan en la definición del ámbito de la acción gubernamental bajo el poder de razón de estado. La crisis de la tierra en Puerto Rico, unida a nuestras necesidades ambientales, ha forzado la creación de medidas innovadoras. J. Costonis & R. DeVoy, *The Puerto Rico Plan: Environmental Protection Through Development Rights Transfer,* Conservation Trust of Puerto Rico and Urban Land Institute, 1975. En Puerto Rico se distingue ya, a través de tales medidas, al igual que sucede en algunas otras jurisdicciones en Estados Unidos, entre los derechos dominicales de índole histórica y el derecho a urbanizar. F. J. James & D. E. Gale, *Zoning for Sale—A Critical Analysis of Transferable Development Rights Programs,* The Urban Institute, 1977, pág. 16. Para los resultados terribles de una planificación pobre en sociedades no opulentas, véase: M. Hauser (ed.) *Urbanization in Latin America,* New York, 1961.

Segundo, el poder de razón de estado se ha mantenido en muchas jurisdicciones en expansión creciente en las últimas décadas. El Tribunal Supremo de Estados Unidos aun ha permitido bajo este poder que se limite en determinadas circunstancias el número de personas que pueden ocupar una vivienda y la relación entre estas. *Village of Belle Terre* v. *Boraas,* 416 U.S. 1 (1974). Véase también: *Penn Central Transportation Company* v. *New York City,* supra. Desde hace largo tiempo muchos tribunales estatales no han reque-

rido en diversas circunstancias el pago de compensación como requisito para validar la transferencia de terrenos dentro o fuera de los límites de una urbanización. *Ridgefield Land Co. v. City of Detroit,* 217 N.W. 58 (Mich. 1928); *Ayres v. City Council of City of Los Angeles,* 207 P.2d 1 (Cal. 1949); *Billings Properties, Inc. v. Yellowstone County,* 394 P.2d 182 (Mont. 1964); *Jordan v. Village of Menomonee Falls,* supra; *Jenad, Inc. v. Village of Scarsdale,* 218 N.Ed.2d 673 (N.Y. 1966); *Sommers v. City of Los Angeles,* 62 Cal. Rptr. 523 (1967); *Southern Pacific Co. v. City of Los Angeles,* 51 Cal. Rptr. 197 (1966), apelación desestimada, 385 U.S. 647 (1967). Ya vimos en la primera parte de esta opinión que en *Seashore Realty, Etc., Co. v. Junta de Planificación,* supra, este Tribunal sostuvo que podía imponérsele a un urbanizador el requisito de efectuar determinadas construcciones fuera de su propiedad.

Tercero, la tendencia descrita se ha extendido en el ámbito internacional a países con tradiciones comparables a las nuestras sobre el concepto de la propiedad. Para el mejor ejemplo debe acudirse a la propia España, de donde arranca nuestro ordenamiento jurídico sobre los derechos reales.[10] La Ley del Suelo de 1956 y la Ley de Reforma de 1975 alteraron profundamente las viejas nociones sobre la vasta libertad del propietario, derivadas del Art. 348 del Código Civil Español, así como nuestra legislación urbanística ha cambiado los conceptos correspondientes. García de Enterria, *Actuación Pública y Actuación Privada en el Derecho Urbanístico,* en Centro de Estudios Hipotecarios del Colegio Nacional

---

[10] Para el desarrollo del concepto de propiedad dentro de la tradición jurídica española y la importancia de la función social de la tierra, véanse: J. Castán Tobeñas, *La Propiedad y sus Problemas Actuales,* Segunda Edición, Editorial Reus, Madrid, 1963, págs. 9, 62 y siguientes, 123 y 126 y siguientes; J. de Camps y Arboix, *La Propiedad de la Tierra y su Función Social,* Editorial Bosch, Barcelona, 1953, *passim.*

de Registradores de la Propiedad en España, *Curso de Conferencia Sobre Propiedad Horizontal y Urbanizaciones Privadas*, Madrid, 1973, págs. 265–267; Diez-Picazo, *Los Procesos de Urbanización y el Marco del Derecho de Propiedad*, *ibid.*, 19.

La ley española vigente—la Ley sobre el Régimen del Suelo y Ordenación Urbana—es una combinación de las dos anteriores. Nuevo Diccionario de Legislación Aranzadi, No. 30298, tomo XXIV, ed. de 1977, pág. 538 *et seq.* Bajo esta ley se requiere de los propietarios afectados por una obra de urbanización que cedan gratuitamente y costeen las obras de construcción de vías públicas, saneamiento, agua, electricidad y alumbrado, parques, jardines y escuelas. Véanse los Arts. 83(3), 84(3), 120 y 122. Véanse además: F. Lliset Borrell, *La Actividad Urbanística de los Particulares*, Madrid, Ed. Montecorvo, 1975; A. Ortega García, *Los Deberes o Cargas en la Legislación Urbanística*, Madrid, Ed. Montecorvo, 1974.

En Francia las lotificaciones pueden estar condicionadas a la participación del desarrollador en el costo de las obras públicas hechas necesarias por la lotificación, a reservas de terrenos y otras medidas. Adicionalmente, en casos de expropiación parcial se requiere descontar de la suma a pagarse cualquier aumento en el terreno no expropiado que surja como consecuencia de la expropiación. Garner (ed.), *Planning Law in Western Europe*, Amsterdam, 1975, págs. 138, 148. Las servidumbres requeridas por la legislación urbanística en materia de calles, carreteras, higiene, estética y asuntos análogos no conllevan usualmente derecho de indemnización. A. Amiaud, *Urbanisme*, París, 1964, pár. núm. 67. La cesión gratuita de terrenos para agrandar o crear vías públicas no puede exceder, sin embargo, el 10% de los terrenos envueltos. R. Cassin & M. Waline, *Les Grands Arrets de Droit de l'Urbanisme*, Sirey, 1974, pág. 86.

En la cuna del derecho común, Inglaterra, la figura del urbanizador privado—tan empotrada en la cultura de Estados Unidos—ha ido desapareciendo forzosamente. La Town and Country Planning Act de 1947, 10 & 11 Geo. 6, c. 51, 25 Halsbury's Statutes of England, 2ª ed., pág. 489 y ss. tuvo como propósito principal nacionalizar el derecho a desarrollar terrenos. Hagman, *Compensable Regulation: A Way of Dealing with Wipeouts from Land Use Controls?*, 54 J. Urban L. 45, 91 (1976); Moore, *The Public Control of Land Use: An Anglophile's View*, 10 Urban Law. 130, 142 (1978); Garner, *supra*, cap. 9. El desarrollador privado de terrenos tiene que satisfacer por legislación reciente una contribución al erario de 80% del beneficio que reciba por el valor de desarrollo de su tierra. Se espera que esta suma se eleve pronto a 100%. Moore, *supra*, 142.

█ Cuarto, las alteraciones que están experimentando las teorías de la propiedad y del poder de razón de estado aun en los sistemas no socialistas tienen su límite en esta jurisdicción. La cláusula de expropiación forzosa ha sufrido y puede continuar sufriendo variaciones en su contenido, pero ni los tribunales ni los parlamentos ni ninguna otra agencia o funcionario gubernamental pueden eliminarla o privarla enteramente de significado. Queda siempre un núcleo irreductible que no puede invadirse por el poder de razón de estado. Esto no monta a la proclamación de la teoría de la disminución del valor, en su función histórica, sino al reconocimiento de que toda esta búsqueda es una búsqueda de la razonabilidad dentro del contexto de este tiempo y este sitio. La tarea ante nos, en otras palabras, es lograr un acomodo razonable entre el poder de razón de estado y el de expropiación forzosa a la luz de las circunstancias específicas de esta contienda y la atmósfera ideológica en que esta se produce.

Al enumerar los primeros cuatro factores, de muy alta jerarquía, hemos descrito generalmente el clima ideológico en

que se desenvuelve este caso. Mencionemos otros factores que puedan ayudarnos en la determinación de ese elusivo fenómeno: la razonabilidad.

Quinto, los beneficios a recibirse por la urbanización representan un elemento importante de juicio. En este respecto conviene conocer, entre otros datos, si el urbanizador compró los terrenos concernidos antes o después de formar parte del Plano Regulador; cómo se refleja este dato en el precio de venta de las casas, en su costo y las ganancias a recibirse; si el urbanizador retuvo predios adyacentes a la urbanización cuyo valor continuará aumentando; cuán atrayente es una urbanización por estar localizada junto a una avenida principal.

Sexto, debe medirse el detrimento a sufrirse por el urbanizador; el grado en que se disminuye el valor de su propiedad en contraste con los beneficios derivables por el interés público; el tamaño de su propiedad frente a la naturaleza de la condición. Una condición como la impuesta en este caso puede constituir, cuando se trata de predios pequeños, un requisito irrazonablemente oneroso. En Finlandia, por ejemplo, la franja de terreno a transferirse no puede exceder el 20% de la propiedad. Garner, *op. cit.*, 113. En Italia no puede exigirse la donación de terrenos para carreteras o plazas adyacentes en exceso de la mitad de la tierra necesaria para tal uso, hasta una profundidad máxima de quince metros. G. Spadaccini, *Urbanistica, Edilizia, Espropiazioni*, Roma, Casa Editrice Stamperia Nazionale, 1969, pág. 140. A menos que se desee que estos asuntos se resuelvan caso a caso por los tribunales, los organismos de planificación deben reglamentar más claramente las circunstancias en que permitirán la imposición de determinadas condiciones. Estas condiciones estarán necesariamente sujetas al escrutinio judicial, pero existirá la ayuda de una política administrativa uniforme.

Sétimo, la identidad de la persona afectada es relevante. Es razonable, en el estado actual de nuestro derecho, que el poder de razón de estado tenga importancia mayor en el caso de quien intenta urbanizar su tierra, a distinción del dueño no empresario cuya tierra quedará atravesada por una calle u otra vía principal. De lo que se trata esencialmente en lo primero es de la reglamentación de un negocio y el grado razonable a que pueda hacerse.

Octavo, hay que medir el impacto socioeconómico en un momento dado de los requisitos que se impongan. ¿Cuál será su efecto sobre la industria de la construcción? ¿Sobre la producción de viviendas adecuadas? ¿Sobre su precio de venta?

Noveno, estos costos públicos deben compararse con el beneficio general que entrañen las condiciones impuestas.

Décimo, debe determinarse si la condición impuesta responde a una política administrativa uniforme para casos comparables.

Undécimo, debe considerarse el grado en que la urbanización contribuye a la exacción o si ésta se debe a un plan público de desarrollo anterior a la solicitud de urbanizar.

Duodécimo, debe examinarse la relación entre el requisito impugnado y la función pública a servirse.

Varios de los factores aquí enumerados fueron adoptados por este Tribunal al considerar la razonabilidad del término en la congelación de terrenos para la construcción de futuras vías públicas. *Flamboyán Gardens* v. *Junta de Planificación*, 103 D.P.R. 884, 891–892 (1975).

En este litigio tan solo nos es dado decidir una de las dos cuestiones constitucionales a que nos referimos al comienzo de la segunda parte de esta opinión. No es posible pro-

ceder al análisis de los factores que acabamos de enumerar y de su relativo peso para fines de determinar la razonabilidad de la acción administrativa impugnada, debido a que la Junta no celebró una vista evidenciaria. Debe celebrarse tal vista para que la Junta haga determinaciones de hecho sobre estos factores, los sopese conforme a su considerable experiencia y produzca así un récord que permita la revisión judicial, si es que ésta se desea. Véanse: *López* v. *Junta de Planificación,* 80 D.P.R. 646, 667 (1958); *P.N.P.* v. *Tribunal Electoral,* 104 D.P.R. 1, 3-4 (1975).

■ Respecto a la otra cuestión, resolvemos que la Junta de Planificación tenía, como tiene hoy la Administración de Reglamentos y Permisos, amplio poder constitucional para imponer en casos adecuados condiciones como las que nos ocupan. Los primeros tres factores que hemos apuntado sólidamente apoyan esta conclusión: las transformaciones que ha sufrido el concepto de la propiedad, la singular situación de Puerto Rico, la expansión del poder de razón de estado en sociedades análogas a la nuestra. Se exigen consideraciones de gran peso para alterar dicha conclusión. No podría ciertamente afirmarse en consideración a los desarrollos ocurridos en este campo y las circunstancias socioeconómicas especiales que vive nuestro país que bajo cualesquiera hechos concebibles los requisitos impugnados pecan de inconstitucionalidad. Estimamos por el contrario que su razonabilidad podría establecerse en multitud de instancias.

*Se devuelve en consecuencia el caso al nivel administrativo para la celebración de la vista correspondiente y la determinación de hechos que permita decidir si el ejercicio del poder que hoy hemos declarado constitucional contraviene o no en este caso nuestro ordenamiento jurídico.*