*963 TEXTO COMPLETO DE LA RESOLUCION
Los interventores-recurrentes, Antonio Roig Sucesores, Inc. y Desarrollos Roig, S.E., solicitan la revisión de una resolución administrativa emitida el 8 de marzo de 1999 por la Junta de Planificación. Mediante dicha resolución se aprobó la consulta de ubicación número 98-51-0396-JPU. La Junta de Planificación aprobó la construcción de un edificio de oficinas de cuatro pisos con una cabida de 100,000 pies cuadrados en un predio de 5.99 cuerdas en la Avenida Boulevard en el Barrio Río Abajo de Humacao. El predio objeto de la consulta, originalmente se identificó con una cabida de 10.99971 cuerdas. No obstante, para atender los señalamientos del Departamento de Recursos Naturales, se modificaron, tanto la cabida (a 5.99 cuerdas) como las estructuras a construirse. Inconformes con dicho dictamen, los interventores recurrentes acuden ante nos.
Contando con la comparecencia de todas las partes, resolvemos y denegamos la expedición del auto de revisión solicitado, luego de que el Tribunal Supremo de Puerto Rico, mediante Sentencia de 28 de junio de 2000, resolviera que la parte recurrente cuenta con legitimación activa para presentar este recurso.
I
El 15 de mayo de 1998, el señor Juan I. López Malavé, por conducto del Arquitecto Elio S. Martínez Joffre, sometió a la consideración de la Junta de Planificación una consulta de ubicación (Consulta Número 98-51-0396-JPU) para un proyecto comercial en la Avenida Boulevard del Barrio Río Abajo del Municipio de Humacao. El predio objeto de la consulta se identificó con una cabida de 10.9 cuerdas, en el cual se proponía la construcción de un proyecto comercial de oficinas, consistente de una estructura de cuatro pisos, con un área de construcción de 100,000 pies cuadrados. El terreno a ser desarrollado está zonificado como Distrito Residencial *964 1 (R-l), según el Mapa de Zonificación de Humacao. Conjuntamente con la consulta, el arquitecto sometió una solicitud de variación o dispensa a disposiciones reglamentarias.
La Junta de Planificación, mediante Resolución del 15 de mayo de 1998, dejó en suspenso la consulta de ubicación con el fin de recibir los comentarios de varias agencias consultadas y cumplir con las disposiciones de la Ley Núm. 9 de 18 de junio de 1970, conocida como la Ley Sobre Política Pública Ambiental, 12 L.P.R.A. see. 1121 et. seq.
El 29 de abril de 1998, la Autoridad de Energía Eléctrica informó que no tenía objeción a que la Junta de Planificación aprobara la consulta. El 1 de mayo de 1998, la Autoridad de Acueductos y Alcantarillados señaló que tanto para el sistema de acueducto como para el sistema de alcantarillado sanitario, el proponente debía mejorar o hacer aportaciones para el sistema existente. Señaló, además, que el proponente debía esperar qüe se terminara el proyecto del Acueducto del Noroeste.
El 6 de mayo de 1998, la Autoridad de Carreteras informó, entre otras cosas, que en su programa de construcción para los próximos cinco años no contemplaba proyecto alguno que afectara el desarrollo de referencia y que se debía consultar al Municipio de Humacao con relación a los accesos por las vías municipales. Por su parte, el Instituto de Cultura Puertorriqueña, mediante comunicación de 20 de mayo de 1998, señaló que para el proyecto se requiere la preparación de una evaluación arqueológica Fase I A y Fase I B.
El Departamento de Recursos Naturales y Ambientales, mediante comunicación de 16 de junio de 1998, indicó que de acuerdo a los datos obtenidos de los planos de canalización del Río Humacao y de los planos sometidos por el proponente, parte del desarrollo ubica dentro de un tramo del Río Humacao, terrenos patrimoniales del Estado. Además, señaló que no obraba en el expediente algún documento que demostrara que un tramo del antiguo cauce (afectado por el desarrollo) sea propiedad del proponente, señor Malavé.
El 13 de julio de 1998, la Junta de Planificación envió al Ledo. Héctor M. Russe Martínez, Presidente de la Junta de Calidad Ambiental, una Declaración de Impacto Ambiental (DIA) Negativa-Interna. De acuerdo a la Resolución de la Junta de Planificación emitida el 8 de marzo de 1999, la Junta de Calidad Ambiental, en comunicación del 6 de agosto de 1998, señaló que se había cumplido con la fase de evaluar el posible impacto ambiental de la acción propuesta, de acuerdo con el Artículo 4(c) de la Ley Sobre Política Pública Ambiental, Ley 9 de 18 de junio de 1970, 12 L.P.R.A. see. 1124, según enmendada, y emitió una serie de recomendaciones al respecto.
La Junta de Planificación celebró vista pública, el 17 de agosto de 1998, en la Casa Alcaldía de Humacao para evaluar la consulta sometida, considerar la prueba y planteamientos del proponente, de las partes interesadas y del público en general. El 18 de junio de 1998, previo a la celebración de la vista, se publicó en el periódico El Vocero un Aviso de Vista Pública indicando que el asunto a discutirse sería la "[p]ropuesta ubicación de un proyecto comercial de oficinas que consiste de la construcción de un edificio de cuatro pisos con un área de construcción de 100,000 pies cuadrados en una finca de 10.9771 cuerdas de las cuales se utilizarán 6.4124 cuerdas para el proyecto propuesto".
Mediante Moción del 21 de agosto de 1998, Antonio Roig Sucesores Inc. y Desarrollos Roig, S.E., (de aquí en adelante los interventores-recurrentes), solicitaron intervención en los procesos administrativos ante la Junta de Planificación, de conformidad con la Ley 170 de 12 de agosto de 1988, conocida como la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. see. 2155 y ss. Los interventores-recurrentes expresaron que tienen un derecho incondicional de comparecer al proceso, debido a que poseen una finca para la cual tienen un desarrollo residencial comercial (Consulta Número 92-51-1021) y que colinda por el Sur y Oeste con los terrenos objeto de la presente consulta, por lo que cualquier decisión que se tomara en el caso podría afectar sus derechos propietarios. El 1 de septiembre de 1998, la Junta emitió Resolución en la que aceptó la solicitud *965 de intervención.
Después de varios trámites procesales, el señor Juan I. López Malavé, (de aquí en adelante el proponente), sometió un "Memorial" en el que modificó su proyecto para ubicarlo en 5.99 cuerdas, en lugar de las 10.9771 originales. Dicha modificación obedeció a los señalamientos hechos por el Departamento de Recursos Naturales.
Mediante Resolución de 8 de marzo de 1999, la Junta de Planificación aprobó la consulta de ubicación sometida por el proponente, Juan I. López Malavé. Se aprobó en esa etapa, la ubicación de un proyecto comercial de oficinas que consiste de la construcción de un edificio de cuatro pisos con un área de construcción de 100,000 pies cuadrados en un predio de 5.99 cuerdas.
No conforme con la determinación de la Junta de Planificación, los interventores Antonio Roig Sucesores, Inc. y Desarrollos Roig, S.E. solicitaron reconsideración, el 5 de abril de 1999, alegando, en síntesis, que el proyecto iba en contra de las leyes y reglamentos aprobados por la Junta.
La Junta de Planificación declaró no ha lugar la moción de reconsideración el 8 de abril de 1999 y notificó su resolución el 30 de abril de 1999. El 19 de mayo de 1999, los interventores-recurrentes presentaron un escrito de revisión ante este Tribunal. Con el beneficio de la comparecencia de todas las partes, emitimos Resolución el 30 de septiembre de 1999 en la que nos negamos a expedir el auto de revisión bajo el fundamento de que los interventores-recurrentes carecían de legitimación activa.
Inconformes con nuestra Resolución, los interventores-recurrentes presentaron, el 16 de noviembre de 1999, una petición de certiorari ante el Tribunal Supremo de Puerto Rico. Allí alegaron, a diferencia de lo alegado anteriormente, los efectos específicos que tendría el proyecto propuesto. En síntesis, señalaron que la resolución de la Junta cambia los factores de los alrededores, lo que "impone una presión de desarrollo y uso de la infraestructura mayor que el que puedan generar los usos permitidos dentro de la zonificación existente"', el proyecto alegadamente también "atrae personas extrañas al lugar; aparte de que el proyecto podría implicar "usos completamente incompatibles con el carácter residencial del área". Juan I. López Malavé p/c Arq. Elio S. Martínez, Junta de Planificación, recurridos v. Antonio Roig Sucesores Inc., Desarrollos Roig, S.E., peticionarios, Sentencia de 28 de junio de 2000, CC-1999-881, a la pág. 15.
Mediante Sentencia de 28 de junio de 2000, el Tribunal Supremo revocó nuestra resolución y resolvió que los interventores-recurrentes poseen legitimación activa para presentar ante este Tribunal el recurso de revisión en el caso de epígrafe. A tales efectos, se devolvió el caso a este foro para la solución en los méritos del recurso presentado. Perfeccionado el recurso y contando con los alegatos de todas las partes, resolvemos.
II
Hechos los anteriores pronunciamientos, pasaremos a considerar los señalamientos de error hechos por los interventores-recurrentes. Estos son:
“PRIMERO: Erró la Junta de Planificación al autorizar un proyecto comercial en una zonificación residencial de baja densidad (Distrito R-l) sin haberse solicitado la variación en uso correspondiente y sin acreditarse las circunstancias especiales por las cuales la Junta de Planificación debe permitir un proyecto comercial en un distrito residencial, de conformidad con el caso T-JAC, Inc. (Wal-Mart) v. Caguas Centrum Limited Partnership, S.E. v. Junta de Planificación, Caso Núm. CC-98-009, resuelto por el Tribunal Supremo de Puerto Rico, el 12 de abril de 1999.

SEGUNDO: Erró la Junta de Planificación al autorizar un proyecto sin que se hubiera acreditado que la variación no afectaría adversamente la disponibilidad de infraestructura, el contexto en el que ubica, el ambiente de la calle y la seguridad y tranquilidad de los vecinos y al no aplicar la teoría del daño 
*966
autoinfligido.

TERCERO: Erró la Junta de Planificación al autorizar un proyecto en el cual no se solicitó la, rezonificación del área antes de solicitar la aprobación del proyecto, de conformidad con el caso TrJAC, Ine.. (Wal-Mart Caguas) v. Caguas Centrum Limited Partnership, S.E. v. Junta de Planificación, Caso Núm CC-98-009, resuelto por el Tribunal Supremo de Puerto Rico, el 12 de abril de 1999.

CUARTO: Erró la Junta de Planificación al autorizar un proyecto que fue enmendado, sin celebrarse la correspondiente vista, la cual es obligatoria, según el Reglamento de Planificación Número 4.

QUINTO: Erró la Junta de Planificación al autorizar un proyecto que no cumplió con el requisito de notificación de vista pública a los vecinos de las propiedades en un radio de 100 metros, según dispone el Reglamento de Planificación Número 4 y el caso de Montoto Pratts v. Pelayo Lorié v. Junta de Planificación, 98 J.T.S. 25.”
Discutiremos, conjuntamente, los primeros tres señalamientos de error señalados por estar íntimamente relacionados.
El predio objeto de la consulta de ubicación presentada por el proponente-recurrido está clasificado como un Distrito Residencial 1 (R-l), según el Mapa de Zonificación del Municipio de Humacao. El distrito R-l se considera como uno de baja densidad poblacional y los usos permitidos para los edificios o pertenencias en el mismo son: casas de una familia, casas en hilera y casas patio y otros usos de acuerdo a lo establecido en la Sección 99.00 del Reglamento de Zonificación (Reglamento de Planificación Núm. 4), Núm. 4844 del 16 de septiembre de 1992, Sección 11.02. Por lo tanto, entre los usos a permitirse en un Distrito R-l, no está un uso como el contemplado en el proyecto sometido en la consulta impugnada, el cual consiste de un edificio de cuatro pisos para oficinas. Tal uso tampoco está contemplado en los usos permitidos vía excepción en la Sección 99.06 del Reglamento de Zonificación, supra. Aún así, puede ser viable la construcción del proyecto ante nuestra consideración de acuerdo a disposiciones del referido reglamento.
La Ley Orgánica de la Junta de Planificación, Ley Núm. 75 de 24 de junio de 1975, según enmendada, 23 L.P.R.A. see. 62 y ss., asigna a dicha agencia la responsabilidad de dirigir el desarrollo integral de Puerto Rico de modo que fomente, en la mejor manera, la salud, seguridad, el orden, la convivencia, la prosperidad, la defensa, la cultura, la solidez económica y el bienestar general de los actuales y futuros habitantes de Puerto Rico. Asociación de Residentes de Park Side, Inc. y otros v. Junta de Planificación, Opinión de 10 de julio de 1999, 99 J.T.S 155, 90.
A tales efectos, la Junta de Planificación es el organismo administrativo que está llamado a dedicar todo sus esfuerzos a la función de integrar y coordinar la formulación e implementación de las políticas y estrategias de desarrollo físico, económico y social de Puerto Rico. Richards Group v. Junta de Planificación, 108 D.P.R. 23, 31 (1978). Por ello, la ley le concedió a la Junta de Planificación la autoridad de adoptar reglamentos para viabilizar la implantación de esa política pública. Dos de los reglamentos más importantes creados, a tales fines, son: Reglamento de Zonificación de Puerto Rico, supra, y el Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Núm. 5244, del 21 de marzo de 1995.
Antes de examinar las disposiciones pertinentes en detalle, consideramos necesario mencionar las disposiciones de ley que detallan las funciones y facultades que tiene la Junta de Planificación, entre las cuales se encuentran las siguientes:

“(1) [ajdoptar normas y reglamentos para su funcionamiento general; [...] (3) [pjreparar, adoptar y recomendar al Gobernador y a la Asamblea Legislativa, el Plan de Desarrollo Integral; (4) [ajdoptar y aprobar los reglamentos que autoriza este Capítulo, el Reglamento de Zonificación y el Reglamentó, de Lotificación y cualesquiera otros necesarios para cumplir los propósitos de este Capítulo; (5) [ajdoptar y 
*967
aprobar los mapas de zonificación y las enmiendas a éstos; [...]; (7) [djispensar el cumplimiento de uno o varios requisitos reglamentarios con el propósito de lograr la utilización óptima de los terrenos y dirigido hacia el objetivo de poner en práctica el desarrollo urbano compacto; o en los casos en que un uso no permitido, pero compatible con el carácter esencial del distrito, la aplicación de los requisitos de los reglamentos resulte en la prohibición o restricción irrazonable del disfrute de una pertenencia o propiedad y se le demuestre, a su satisfacción, que dicha dispensa aliviará un perjuicio claramente demostrable, pudiendo imponer las condiciones que el caso amerite para beneficio o protección del interés público [...]; (13) [p] reparar y adoptar Planes de Usos de Terrenos, conforme a lo dispuesto en este Capítulo; (14) [hjacer determinaciones de usos de terrenos dentro de los límites territoriales del Estado Libre Asociado de Puerto Rico, con sujeción a las normas y requisitos consignados en la ley, o cualquier ley aplicable. Art. 11 de la Ley 75 de 24 de junio de 1975, según enmendada, conocida como la Ley Orgánica de la Junta de Planificación, 23 L.P.R.A. sec. 62j (1) (3) (4) (5) (7) (13) (14). ”

Por otro lado, el Artículo 16, id., 23 L.P.R.A. sec. 62o, dispone que el Reglamento de zonificación se aprobará:

“(a) [pjara establecer distritos y zonas, tanto en las áreas urbanas como rurales, el uso y desarrollo de los terrenos y edificios públicos y privados, para tales fines, como industria, comercio, transporte, residencia, actividades cívicas y públicas o semipúblicas, deportivas, de recreo, incluyendo playas y balnearios; ...[y] (h) para establecer condiciones y normas para dispensar de los requisitos del Reglamento, mediante concesiones y autorizaciones directas... ”.

Según se desprende del Artículo 11, id., sec. 62j, uno de los deberes de la Junta es la preparación del Plan de Usos de Terrenos. Estos planes tienen el deber de designar la distribución, localización, extensión e intensidad de los terrenos para propósitos urbanos, rurales, agrícolas, de explotación minera, recreación, actividades comerciales, industriales, educativas, públicas e institucionales, entre otras. Los Planes de Usos de Terrenos deben estar en consonancia con el Plan de Desarrollo Integral, además de que serán, junto con la disponibilidad y programación de la infraestructura, la base para la preparación y revisión de los Mapas de Zonificación. Además, toda obra o proyecto a ser realizado por cualquier persona o entidad, deberá estar de acuerdo con las recomendaciones de los Planes de Usos de Terreno. Art. 14, id. sec. 62m.
De las disposiciones antes mencionadas, surge con claridad que la Junta de Planificación, si bien tiene el deber de adoptar reglamentos dirigidos a lograr la consecución de su encomienda fijada por ley, de igual forma está facultada para eximir del cumplimiento de los requisitos que en ellos se establezcan, siempre que el mismo reglamento provea las condiciones bajo las cuales ello será factible. Véase como persuasivo, Empresas Puertorriqueñas de Desarrollo, Inc. v. Junta de Planificación, KLRA-98-00078, Resolución de 13 de agosto de 1998, Circuito Regional IV, Rossy García, Juez Ponente.
Como resultado de los poderes delegados a la Junta de Planificación en las disposiciones de ley antes señaladas, ésta ha aprobado una serie de reglamentos de los cuales dos son de vital importancia para la controversia ante nos. Nos referimos al Reglamento de Zonificación y al Reglamento para Procedimientos Adjudicativos de la Junta de Planificación, supra. Estas disposiciones reglamentarias van a la médula del asunto ante nuestra consideración, debido a que establecen las condiciones bajo las cuales se puede eximir el cumplimiento de los requisitos reglamentarios que determinan los usos permitidos en las diferentes áreas de acuerdo a su zonificación.
Primero, la Sección 2.00, sub-sección 2.01, del Reglamento de Zonificación, define el proceso de consulta de ubicación de la siguiente manera:
“Procedimiento ante la Junta de Planificación para que evalúe, pase juicio y tome la determinación que estime pertinente sobre propuestos usos de terrenos que no son permitidos ministerialmente por la reglamentación aplicable en áreas zonificadas, pero que las disposiciones reglamentarias proveen para que se *968 consideren. En áreas no zonificadas, incluye propuestos usos de terrenos que por su naturaleza, complejidad, magnitud, impacto físico, económico, ambiental y social pudiesen afectar, significativamente, el desarrollo dé un sector. Esta consulta se identifica como pública o privada dependiendo quién la origine e incluye los proyectos de desarrollos extensos a considerarse bajo las disposiciones de las secciones 95.00, 96.00 y 97:00 de este Reglamento. ” [Enfasis suplido]
Idéntica definición nos provee la Sección 2.00 (6) del Reglamento Adjudicativo, supra. Además, en la Sección 3.03 del referido reglamento, se menciona que entre los proyectos en áreas zonificadas. que requieren consulta se encuentran: aquéllos cuyo uso e intensidad no son permitidos ministerialmente por el Reglamento de Zonificación o por un Plan de Ordenación Municipal, sino que dicha reglamentación permite que los mismos puedan ser autorizados por la Junta en el ejercicio de sus facultades discrecionales.
A la hora de evaluar una consulta de ubicación, la Junta deberá tomar en consideración, entre otros, su propia Ley Orgánica; la Ley de Municipios Autónomos (Ley 81 del 30 de agosto de 1991, según enmendada, 21 L.P.R.A. see. 4001 y ss.); Plan de Desarrollo Integral; Objetivos y Políticas Públicas del Plan de Usos de Terrenos; Planes de Usos de Terrenos (incluye Mapas de Expansión Urbana); Mapas de Zonificación, Mapas de Zonas Susceptibles a Inundaciones; Planes de Ordenación Territorial; Planes Regionales adoptados por la Junta; Reglamentos de Planificación; Programa de Inversiones de Cuatro Años; localización del proyecto, usos existentes en el sector; situación de la infraestructura física y social del lugar; condición de inundabilidad y del subsuelo; densidad poblacional; grado de contaminación del ambiente; distancia entre los terrenos y las áreas construidas, importancia agrícola, ambiental o turística de los terrenos, y otras condiciones económicas y físicas análogas. Reglamento de Adjudicación, sub-sección 7.01. (Citas omitidas)
Ya que la definición de consulta de ubicación incluye los proyectos de desarrollos extensos como uno de los que habrá de considerarse mediante ese procedimiento, la sub-sección 2.01 del Reglamento de Zonificación nos define este tipo de proyecto como uno que comprende ”[e]l desarrollo de facilidades comerciales, industriales, institucionales o recreativas que excedan veinte mil (20,000) pies cuadrados de construcción o en terrenos que excedan cuatro mil metros cuadrados".
Por su parte, el Tópico 12 del Reglamento de Zonificación, supra, se compone de las secciones 95.00, 96.00 y 97.00, antes mencionadas, en la definición de consulta de ubicación. La Sección 95.00 establece que tanto la Junta de Planificación como la Administración de Reglamentos y Permisos, podrán considerar proyectos de obras de urbanización de terrenos de acuerdo a las secciones 96.00 y 97.00, respectivamente. La Sección 95.03, por su parte, establece que tanto la Junta como la Administración de Reglamentos y Permisos (A.R.P.E.), aprobarán los proyectos de desarrollos extensos, siempre y cuando evalúen, sin limitarse a, los siguientes criterios: (1) conformidad del uso propuesto y su intensidad con el Plan de Usos de Terrenos hasta donde éste haya sido adoptado o estudiado; (2) disponibilidad, programación y mejoras propuestas por el proyecto a la infraestructura del sector en que ubica; (3) la forma en que el proyecto propicia el desarrollo integral del sector y mantiene o mejora las condiciones existentes; (4) la viabilidad, adecuacidad y conveniencia del uso propuesto.
A diferencia de los proyectos de desarrollos extensos que se considerarán por A.R.P.E., los que habrán de considerarse por la Junta, según dispone la Sección 97.01, podrán ser sometidos para consideración solos o combinados, independientemente del distrito en que se propongan.
Con relación a los tipos de proyectos que nos conciernen (Proyectos de Desarrollos Comerciales Extensos), la Junta los considerará de acuerdo con los siguientes factores:
“1. La cabida del predio excederá el máximo permitido como cambio de zonificación y cada estructura ubicará en un solar con tamaño suficiente para proveer el estacionamiento requerido„

*969
2. El proyecto está conforme con las recomendaciones del Plan de Usos de Terrenos hasta donde éste haya sido adoptado o estudiado.

3. Si la infraestructura necesaria para atender las necesidades del proyecto propuesto y para mitigar sus efectos directos e indirectos, está disponible o puede proveerse.

4. Se celebrará vista publica con notificación a los dueños de propiedades en un radio de cien (100) metros del área en que se propone el proyecto, medidos tomando los puntos más cercanos en dicha área y cada una de las referidas propiedades.” [Reglamento de Zonificación, Sección 97.03]. [Enfasis suplido].
Debido a que el primer factor para poder considerar un proyecto comercial extenso, es que "la cabida del predio excederá el máximo permitido como cambio de zonificación", veamos cuál es el máximo permitido para un cambio de zonificación para un Distrito C-2. El Tópico 3 del Reglamento de Zonificación, sobre el tema de los Mapas de Zonificación, en su Sección 4.05, cuenta con una tabla en la cual se dispone que se podrán someter cambios de zonificación para un distrito de acuerdo a los tamaños máximos de las propiedades que se establecen en la misma. En el renglón pertinente, dispone la referida tabla que si se solicita la conversión de un distrito, a uno C-2 (Comercial intermedio), la propiedad para la cual se solicita tal conversión no podrá exceder de 2,000 metros cuadrados. Esa misma Sección 4.05 establece claramente que aquellas propiedades que excedan los tamaños máximos indicados, se tramitarán de acuerdo a las secciones 95.00, 96.00 y 97.00 sobre Desarrollos Extensos. Si tomamos en consideración en forma integrada la Sección 4.05 con el primer inciso de la Sección 97.03 antes mencionada, podemos notar que hay total concordancia entre sus disposiciones. Una claramente nos refiere a la otra. En otras palabras, si el proyecto no procede como cambio de zonificación, se evalúa como un desarrollo extenso si cumple con los requisitos reglamentarios.
Para que la Junta pueda considerar los Proyectos de Desarrollos Extensos, la parte interesada tiene primeramente que someterlos ante ella mediante una consulta de ubicación. Además, las consultas de ubicación de proyectos de desarrollos extensos, como el solicitado en este caso, se rigen por las disposiciones de las secciones 95.00 y 97.00 del Reglamento de Zonificación. Esto último excluye la aplicación de las disposiciones relativas a variaciones en uso o excepciones, secciones 98.00 y 99.00 del Reglamento de Zonificación. Además, cuando el predio donde se propone un proyecto comercial, excede el tamaño dispuesto en la Sección 4.05, la consulta de ubicación no se tramita como un cambio de zonificación, sino como un desarrollo extenso. Por esta razón, no le son aplicables las disposiciones y requisitos contenidas en las secciones referentes a Mapas de Zonificación. Empresas Puertorriqueñas, supra.
En este caso, se presentó una consulta de ubicación ante la Junta de Planificación para construir un proyecto comercial de oficinas consistente de un edificio de cuatro pisos con un área de 100,000 pies cuadrados en una finca de 10.9971 cuerdas en la Avenida Boulevard de Humacao de las cuales se utilizarían 6.4124 cuerdas para el proyecto propuesto. A pesar de ello, antes de aprobarse finalmente la consulta, se modificó la cabida del predio, de 10.9971 a uno de 5.99 cuerdas. Esto obedeció a que el Departamento de Recursos Naturales señaló que parte del predio de 10.9971 cuerdas contenía una faja de terreno perteneciente al Estado. A la misma vez, se modificaron las estructuras a construirse para atemperarlos a las recomendaciones de dicho departamento.
Tal y como señaló la Junta de Planificación en sus Conclusiones de Derecho, ese uso no está autorizado en un distrito R-l. Aún así, concluyó la Junta que el proyecto satisface todas las disposiciones reglamentarias antes mencionadas sobre consultas de ubicación, desarrollos extensos, y sobre la no procedencia de un cambio de zonificación, debido a que la propiedad en cuestión excede los tamaños máximos permitidos para ese tipo de cambio. En este caso, nos referimos a un predio de 5.99 cuerdas, el cual excede el límite máximo de 2,000 metros cuadrados para hacer viable un cambio de zonificación.
III
A esto señalaron los interventores recurrentes que si el uso no está permitido en el distrito, la consulta es *970 una variación. Por medio de las disposiciones reglamentarias antes mencionadas, podemos colegir que ello no es así, ya que se vislumbran los proyectos de desarrollos extensos y las variaciones como cosas diferentes, e incluso, los requisitos para la aprobación de unas u otras, también es diferente.
Argumentan, además, los interventores, que el peticionario solicitó, a través del Arq. Elio S. Martínez, una variación en uso al amparo de la Sección 98.05 del Reglamento de Zonificación y que la Junta erró al no disponer sobre la misma. Argumentan que el peticionario-recurrido asume la responsabilidad de su petición y que sabe que su petición conlleva la evaluación de una variación. Por su parte, el peticionario-recurrido señala que solicitó la variación en uso por error o inadvertencia.
Como vimos, existen varias disposiciones reglamentarias que le dan a la Junta de Planificación la potestad de permitir la aprobación de usos diferentes a los previamente dispuestos para los distintos distritos zonificados. Entre ellos, los proyectos de desarrollos extensos y los cambios de zonificación. Existen otros mecanismos dispuestos por el Reglamento de Zonificación que también permiten ese resultado. Estos son las disposiciones sobre variaciones y excepciones. Nos limitaremos a estudiar las disposiciones sobre variaciones, ya que se argumenta por la interventora-recurrente que la Junta erró al no aplicarlas en el presente caso.
La variación se define en el Reglamento de Zonificación, supra, Sección 2.00, como:

“una autorización para utilizar una propiedad para un uso prohibido por las restricciones impuestas a una zona o distrito y que sólo se concede para evitar perjuicios a una propiedad, que debido a circunstancias extraordinarias, la aplicación estricta de la reglamentación equivaldría a una confiscación de la propiedad. ”

La Sección 98.05 del Reglamento de Zonificación, supra, establece la figura de la variación en uso para la situación en que el propietario de un terreno desea utilizarlo para fines no permitidos en la zona donde ubica. La referida sección establece la facultad de la Junta para eximir de los requisitos de zonificación cuando existen circunstancias excepcionales y siempre que tales circunstancias no hayan sido creadas por el mismo dueño del terreno. La Junta puede conceder variaciones en uso cuando se establezca claramente que ninguno de los usos que están permitidos en el distrito, es factible en la propiedad desde el punto de vista físico o económico. La Sección 98.05 enumera, además, algunos factores que la Junta debe tomar en consideración al conceder una variación en uso. Asociación de Residentes de Park Side, supra, a la pág. 190. Esos factores, entre otros, son:

“1. El costo de adaptar la propiedad a los usos permitidos debido a disposiciones de éste u otros reglamentos y el beneficio que se derivaría, una vez adaptada ésta para los usos permitidos.

2. El uso para el cual se solicita la variación a las disposiciones reglamentarias, es compatible con los propósitos del distrito y con el vecindario o comunidad en que ubica.

3. Las razones por las cuales ningún uso permisible es factible en. la propiedad sin la variación, deben ser únicas a la misma y no una característica general del distrito o del sector del distrito donde ubica. No podrán haber sido causadas por el dueño.

4. La variación solicitada no afecta adversamente, entre otros, los siguientes factores:

a. la disponibilidad de infraestructura

b. el contexto en el que ubica

c. el ambiente de la calle

d. la seguridad y tranquilidad de los vecinos.

*971 5. El uso propuesto beneficia al vecindario.
6. El uso para el cual se solicita la variación está permitido por las disposiciones del Tópico sobre Zonas Escolares de este Reglamento. ” [Sección 98.05, supra].
Las disposiciones sustantivas sobre variaciones en uso se encuentran complementadas por requisitos de índole procesal establecidos en las secciones 4.06 y 4.08 del Reglamento de Zonificación. Aunque las referidas secciones establecen los requisitos procesales para solicitar una rezonificación, dichos requerimientos son igualmente aplicables cuando se solicita una variación en uso. Asociación de Residentes di Park Side, supra, a la pág.192.
Como hemos expuesto, el trámite de la consulta, por considerarse un proyecto de desarrollo extenso de acuerdo a los parámetros reglamentarios de la Junta de Planificación, no se rige por las disposiciones referentes a variaciones. Por ello, y en atención a los criterios establecidos en la Sección 4.05 y cumpliendo con los requisitos de la Sección 97.03 (1), la Junta de Planificación actuó correctamente al considerar la consulta sometida como un proyecto de desarrollo extenso y no como una variación en uso. Consideramos razonable que la Junta no tiene que advertir en un anuncio de prensa, algo que no va a considerar por no ser lo procedente de acuerdo con la reglamentación aplicable.
IV
Como vimos, el segundo requisito para la evaluación de un proyecto comercial extenso, es que el mismo esté de acuerdo con el Plan de Usos de Terrenos hasta donde haya sido aprobado o estudiado. En este caso, el proyecto objeto de consulta radica en el Municipio de Humacao. Conforme las disposiciones de la Ley de Municipios Autónomos, este municipio se encuentra en el proceso de preparación y aprobación de su Plan de Ordenación Territorial. Para entrar en vigencia, los Planes de Ordenación requerirán su aprobación por la Asamblea Municipal, su adopción por la Junta de Planificación y su aprobación por el Gobernador. Artículo 13.008 de la Ley 81 de 30 de agosto de 1991, según enmendada, conocida como la Ley de Municipios Autónomos, supra, sec. 4606. Señala, además, la ley, que los reglamentos de la Junta o de ARPE continuarán en vigor y se aplicarán a los municipios. Aquellos reglamentos de estas agencias o partes de estos reglamentos, que el municipio contemple sustituir de acuerdo a lo establecido en esa ley, "se aplicarán hasta que los nuevos Reglamentos y Planes de Ordenación entren en vigor". Art.13.020, id., see. 4618. Por esta razón, en este caso son de aplicación los reglamentos y planes adoptados por la Junta de Planificación.
Señalan los interventores-recurrentes que el proyecto aprobado en la consulta de referencia, no está de acuerdo con el Plan de Usos de Terrenos, requisito necesario de acuerdo a la Sección 7.01 del Reglamento Adjudicativo, supra y de la sección 97.03(2) del Reglamento de Zonificación, supra. A esos efectos señala que el documento titulado Objetivos y Políticas Públicas del Plan de Usos de Terrenos (Reglamento 5414 del 31 de octubre de 1975) constituye un Plan de Terrenos y que es el aplicable en Puerto Rico.
En el antedicho documento, se dispone en su noveno "por cuanto" y en el Mensaje de Revisión que el mismo ha de servir de "guía a las agencias e instrumentalidades públicas en la formulación de políticas, estrategias, planes, programas, y en la toma de decisiones sobre los proyectos públicos y privados, así como en el proceso de usos de terrenos en general”.
Las Metas y Objetivos de Política Pública de Desarrollo Urbano de dicho documento, tienen como propósito principal "propiciar comunidades, pueblos, y ciudades densas, compactas y atractivas que permitan el uso intensivo de los terrenos dentro de los perímetros urbanos, logrando una mayor eficiencia en la instalación y operación de los servicios y facilidades públicas...". (Citas omitidas).
De acuerdo con el objetivo establecido en la sección 1.01, se pretende ordenar y guiar el crecimiento físico-espacial de las áreas urbanas. Ello se lograría por medio de los Planes de Usos de Terrenos en diferente *972 escala, Planes de Ordenación Territorial, Mapas de Extensión Urbana y la aplicación de instrumentos de implantación, como zonificación y nuevas competencias, hacia aquellos lugares donde es deseable encauzar el crecimiento urbano.
En la resolución recurrida, la Junta de Planificación señala que los terrenos en este caso "fueron seleccionados para desarrollo urbano por estar incluidos en el Mapa de Expansión Urbana del Municipio de Humacao (el cual es parte del Plan de Usos de Terrenos) y se ajustan a los criterios establecidos en los Objetivos y Política Pública del Plan de Usos de Terrenos y los criterios del Plan de Desarrollo Integral". (Resolución del 8 de marzo de 1999, Conclusión de Derecho 2 (d)). Tales aseveraciones no fueron cuestionadas por la parte recurrente.
Entre los requisitos a tomarse en consideración para lograr los objetivos de la antes mencionada Sección 1.01, se encuentran los siguientes: "seleccionar para propósitos urbanos, como primera prioridad, terrenos en áreas edificadas que propicien el desarrollo y la densificación selectiva, bolsillos de terrenos vacantes (que no constituyan espacios abiertos), terrenos que no sean de alta productividad agrícola o inundables y donde exista o se pueda mejorar, operar y mantener a un costo razonable la estructura; descartar para usos urbanos aquellos terrenos donde ubiquen recursos naturales de importancia que sean ambientalmente críticos o donde exista la condición de contaminación ambiental que represente un riesgo a la salud, así como el uso de terrenos sumamente escarpados, susceptibles de erosión, a deslizamientos y de alto riesgo a desastres naturales".
Aplicando dichas disposiciones, la Junta concluyó en su resolución que el proyecto se ajusta a las Metas Generales Sobre los Usos de los Terrenos, puesto que propende a un desarrollo integral sostenible, y constituye un uso juicioso del terreno sin que se afecten recursos naturales y compatibles ecológicamente con las condiciones del sector donde ubica. Asimismo, según la Junta, "el proyecto propuesto no utiliza terrenos agrícolas que ameriten conservarse y no afecta la calidad del agua, ni del aire". Apéndice de la parte recurrente, pág. 9. Concluyó, además, la Junta que "los terrenos objeto de consulta cuentan con la , infraestructura requerida, y de ser necesario, la misma puede mejorarse". Id., pág. 10. Además, según la Junta, "el predio ubica en zona inundable 2, tiene niveles, y siempre que cumpla con requerimientos del Reglamento de Zonas Susceptibles a Inundación, el proyecto es permisible". Id., pág. 10. [Resolución del 8 de marzo de 1999, Conclusión de Derecho 2 (f) (2)]. Estas conclusiones tampoco fueron impugnadas por la recurrente.
Por último, queremos hacer mención del señalamiento de la recurrente en el sentido de que la consulta infringe la Sección 2.02 del documento de Objetivos y Políticas Públicas del Plan de Usos de Terrenos. Dicha sección menciona que al intensificar los usos comerciales y de servicios, tanto públicos como privados se debe usar como criterio, entre otros, requerir que los proyectos comerciales y de servicios se ubiquen en terrenos identificados y destinados para usos comerciales y de servicios". Ibid.
Al aplicar dicha sección, la Junta determino lo siguiente: "Asimismo, el propio Reglamento de Zonificación establece como uno de los propósitos del Distrito Residencial R-l, como lo es el predio objeto de consulta, el clasificar terrenos para facilitar, según se justifique, las necesidades del crecimiento urbano'. En este caso, los terrenos están identificados para uso urbano con una zonificación que propicia cualquier uso urbano que se justifique, pudiendo ser dicho uso uno comercial, por lo que está conforme con la sub-sección 2.02 de los Objetivos y Políticas Públicas del Plan de Usos para Terrenos". [Resolución del 8 de marzo de 1999, Conclusión de Derecho 2 (d)]. A tenor con ello, la Junta entendió que el predio, identificado como R-l, estaba dentro del Mapa de Expansión Urbana, lo que implica que está destinado para uso urbano, y que un uso comercial, es un uso urbano. Véase Empresas Puertorriqueñas, supra. En este caso, la parte recurrente tampoco contradijo esa conclusión.
Otro de los criterios utilizados por la Junta, es que, a pesar de que el Municipio de Humacao aún no ha aprobado su Plan Territorial, el proyecto es compatible con el Plan hasta donde éste ha sido estudiado,, pues *973 promueve convertir a Humacao en el centro de actividades de servicio de los municipios cercanos como se establece en el Apartado 13 del propuesto Plan Territorial, Enunciación de Objetivos y Plan de Trabajo del 23 de agosto de 1975. (Conclusiones de Derecho, 2(c)]. Apuntan los interventores recurrentes que el proyecto no está de acuerdo con el quinto objetivo general de dicho Plan. Tal objetivo pretende articular el proyecto de desarrollo de los márgenes del Río Humacao como foco de desarrollo cívico, recreativo, deportivo y cultural. Aún así, no nos presenta evidencia que indique que el proyecto radica en los márgenes del Río Humacao y no en el antiguo cauce de dicho río, como alega el proponente en su "Duplica a Réplica a Memorando en Oposición" del 22 de junio de 1999, a la página 4. La Junta, en su resolución, tampoco concluyó que tales terrenos queden al margen del Río Humacao, que ya fue canalizado en ese sector.
y
La interventora-recurrente nos señala que los pronunciamientos hechos por el Tribunal Supremo en el caso T-Jac (Wal-Mart Caguas) v. Caguas Centrum Limited Partnership, S.E. v. Junta de Planificación, opinión de 12 de abril de 1999, 99 J.T.S. 54, son de aplicación directa a este recurso. Diferimos. Al estudiar el caso ante nos y el caso T-Jac, id., llegamos a la conclusión de que ambos tienen diferencias sustanciales en cuanto a los elementos fácticos y procesales, por lo que todos los pronunciamientos allí esbozados no son de aplicación al caso de autos. Veamos.
En T-Jac, id., se trataba de la aprobación de una consulta de ubicación de un proyecto industrial liviano en un predio clasificado R-l, (residencial) con un pequeño predio clasificado como 1-1 (industrial).
La consulta de ubicación aprobada consistía en desarrollar 28 solares, en los cuales se establecerían talleres de reparación y almacenes, entre otros usos. Seis días después, la Junta autorizó una enmienda a la consulta de ubicación, en la cual se redujo el número de solares de 28 a 8, variándose, además, las cabidas de los predios. A tales efectos, A.R.P.E. autorizó un plano preliminar alterno para el proyecto industrial liviano. Tres años después, se solicitó otra enmienda a la consulta de ubicación. Se solicitó en esa ocasión, el cambio del proyecto previamente aprobado, de un desarrollo industrial liviano a uno comercial. En uno de los solares se construiría una tienda Wal-Mart de ventas al detal. Se celebraron vistas públicas y se aprobó el proyecto como una enmienda al original.
Cabe señalar, además, que en el caso de T-Jac, la consulta original y la primera enmienda ya habían vencido hacía más de dos años, por lo que A.R.P.E. sólo estaba facultada para continuar el proceso hasta su etapa final, como uno industrial solamente. T-Jac, id., a la pág. 889.
En la consulta original, la Junta estableció que se utilizarían los parámetros aplicables de un distrito 1-1, donde sólo se permiten ministerialmente usos industriales livianos. Ninguno de esos usos contemplados admite un uso comercial como el finalmente propuesto. En otras palabras, el uso propuesto en ese caso no armonizaba con el permiso concedido originalmente para el uso de los terrenos, toda vez que desde el 1988, éstos fueron contemplados para uso industrial. T-Jac, id., a la pág. 888.
Se desprende, entonces, que en ese caso, el proyecto original y el que finalmente se aprobó mediante enmienda diferían sustancialmente en sus fines, propósitos, en la extensión del área de construcción y en la cantidad de tráfico vehicular. Allí, la enmienda propuesta se apartó totalmente de la obra que se concibió en un principio y para la cual las agencias pertinentes brindaron sus comentarios y aprobación. T-Jac v. Caguas Centrum, Lim Part; Sentencia de 19 de mayo de 1997, KLAA-96-00360, Circuito Regional VI, Pesante Martínez, Juez Ponente. KLAA-96-00360. Es por ello que el Tribunal Supremo resolvió que se requería la radicación de una nueva consulta. T-Jac, supra, a la pág. 889.
Ninguna de esas situaciones se da en el caso ante nuestra consideración. Por el contrario, en este caso, la Junta aprobó desde el primer momento un proyecto comercial en un distrito R-l. El concepto del proyecto nunca cambió. Al aprobar el proyecto, la Junta aplicó las disposiciones reglamentarias y de ley que le permiten *974 así hacerlo. Para ese proyecto, y no otro distinto, fue que se llevaron a cabo las vistas públicas requeridas y se recibieron las recomendaciones de las agencias concernidas.
La situación de hechos en el caso de epígrafe enmarca con las disposiciones referentes a los desarrollos extensos, por lo que no era necesario solicitar una rezonificación del área, ni una variación en uso. Esa ha sido la interpretación que la Junta de Planificación le ha dado consistentemente a sus propios reglamentos en casos de esta índole. No encontramos que en ello haya habido una interpretación irrazonable o que haya mediado abuso de discreción de la Junta.
A tales efectos debemos señalar que la Junta es una agencia que tiene la autoridad para aprobar e interpretar sus propios reglamentos por lo que no entraremos a cuestionar su interpretación, ya que, como hemos visto, no medió ilegalidad o abuso de discreción en su actuación. Misión Industrial de P.R. v. Junta de Planificación, Opinión de 30 de junio de 1998; 98 J.T.S. 79, pág. 1161.
Por otro lado, en T-Jac, el planteamiento principal de los peticionarios era. que "para los. proyectos de desarrollos extensos regulados por la Sección 97.0, no hay que cumplir con los requisitos de la Sección 98 y demás disposiciones reglamentarias, en vista del citado lenguaje de la regla, al efecto de que se le someterán los proyectos independientemente del proyecto en que se propongan". T-Jac, supra, a la página 887. Esa no es la situación del caso que nos ocupa, ya que en la Resolución de la Junta de 8 de marzo de 1999, se analizó el proyecto, a la luz de todas las disposiciones reglamentarias aplicables.
VI
Como cuarto señalamiento de error, los interventores recurrentes alegan que erró la Junta al autorizar un proyecto que fue enmendado, sin celebrarse la correspondiente vista, la cual es obligatoria, a tenor con la Sección 97.03 del Reglamento de Zonificación.
Esta sección requiere la celebración de una vista pública con notificación a los dueños dé las propiedades en un radio de 100 metros del área en que se propone el proyecto, en aquellos casos en que habrá de considerarse por la Junta un proyecto de desarrollo comercial extenso.
El proyecto ante nuestra consideración, originalmente fue concebido para localizar un edificio de cuatro pisos con un área total de construcción de 100,000 pies cuadrados. El aviso de vistas públicas, publicado en el periódico El Vocero, el 18 de junio de 1998, indicó que el asunto a discutirse sería la propuesta ubicación de un proyecto comercial de oficinas que consiste de la construcción de un edificio de cuatro pisos con un área de construcción de 100,000 pies cuadrados en una finca de 10.9971 cuerdas de las cuales se utilizarán 6.4124 cuerdas para el proyecto propuesto. Las vistas públicas se llevaron a cabo, el 17 de agosto de 1998.
Luego de recibidos los comentarios del Departamento de Recursos Naturales en el sentido de que parte del desarrollo propuesto ubica dentro de terrenos patrimoniales del Estado, los proponentes sometieron a la Junta un Memorial, el 10 de febrero de 1999, introduciendo varias modificaciones al proyecto originalmente propuesto.
Según se desprende del antedicho "Memorial" y de la Resolución emitida por la Junta, el 8 de marzo de 1999, en la Determinación de Hechos Núm. 2, los proponentes modificaron el proyecto para qüé ubique en un predio de 5.99 cuerdas, dejando fuera la parte del terreno perteneciente al Estado. Además, se propuso la "relocalización del edificio de oficinas propuesto hacia el sur de la ubicación original". "El proyecto para ajustarlo a la reducción en cabida, se modificó para proveer parte de los estacionamientos en un edificio de \ cuatro niveles en bandejas en el que se habilitarán 532 espacios de estacionamiento. Además, se habilitarán en j espacios abiertos 433 espacios de estacionamiento, lo que sumaría un gran total de 965 espacios para \ estacionamiento. No obstante, se relocalizarán los 300 espacios para estacionamiento abierto existentes, por lo \ que habría un aumento neto en espacios de estacionamiento de 625. Este aumento neto excede en 157 los i *975 espacios de estacionamientos originalmente propuestos que eran 448".
Luego de las modificaciones propuestas al proyecto original por razón de los comentarios del Departamento de Recursos Naturales, el Arq. Elio S. Martínez Joffre sometió un plano del proyecto propuesto con las consabidas modificaciones. Del plano se desprende que el edificio de oficinas sería de cuatro pisos con un área de constmcción de 100,000 pies cuadrados. También se vislumbra la construcción del estacionamiento multinivel antes mencionado con un área de 165,969.55 pies cuadrados.
El Reglamento de Procedimientos Adjudicativos, en su Sección 7.02, permite que la Junta pueda considerar enmiendas a consultas ya aprobadas o que estén en proceso de aprobación. Esta sección dispone:
“De surgir la necesidad de hacer cambios a un proyecto que alteren la consulta aprobada vigente, se deberá someter una solicitud de enmienda a la Junta explicando en detalle la naturaleza de la enmienda y la razón para la misma, así como toda la documentación (nuevos planos, estudios, etc.) pertinente y necesaria para que la Junta pueda tomar la determinación correspondiente. La solicitud y documentación se radicará, en original e igual número de copias que una consulta nueva, en la Oficina del Secretario de la Junta. Como resultado de la evaluación de los cambios propuestos y dependiendo de la naturaleza y magnitud de los mismos con relación a la consulta original, la Junta podrá requerir la radicación de una nueva consulta y el cobro correspondiente. La radicación de una enmienda, antes de la Junta tomar una determinación sobre la consulta radicada originalmente, podría tener el efecto de reiniciar los trámites interagenciales. ’’ [Ld.; énfasis nuestro].
En cuanto a las enmiendas a consultas aún no aprobadas, se desprende de la antedicha disposición, que la Junta debe evaluar la documentación presentada por el proponente y, a raíz de la misma, determinar si las enmiendas planteadas son de tal magnitud que ameritan el reinicio de todos los trámites interagenciales, incluyendo los de la Junta. En este caso, la Junta concluyó que la modificación propuesta "[n]o es significativa de forma tal que no altera el concepto de usos de terrenos propuestos y la misma satisface las disposiciones reglamentarias y de política pública aplicables". [Resolución del 8 de marzo de 1999, Conclusion de Derecho 2 (g)]-
La Junta actuó de acuerdo a su criterio en el sentido de que las modificaciones hechas al proyecto propuesto originalmente, no ameritaban el reinicio de los trámites interagenciales, incluyendo la celebración de una nueva vista pública.
Tal y como señala la Junta en su Memorando en oposición, su criterio es que ”[n]o se propuso enmienda alguna al proyecto aprobado, sino que lo hecho fue modificar la cabida del predio (de 10.9 a 5.99 cuerdas) para atender los señalamientos del Departamento de Recursos Naturales y Ambientales y se modificó en otros aspectos, pero el proyecto sigue consistiendo en un edificio de cuatro pisos con un área de construcción de 100, 000pies cuadrados". (Moción de Desestimación y/o en Oposición a que se Expida el Recurso de Revisión, pág. 17) Además, es razonable que al reducirse el predio originalmente propuesto para el proyecto se buscara una forma más eficaz de localizar los estacionamientos que servirían al proyecto propuesto.
Se trata del mismo uso en el mismo predio. Lo único que se modificó fue la cabida del mismo para atemperar el proyecto a los señalamientos de una de las agencias concernidas, y, por ello, se propuso la construcción de un edificio de estacionamientos. Anteriormente, los estacionamientos se vislumbraban al nivel del suelo. Las modificaciones hechas no equivalen a un cambio en usos de terrenos, ni al concepto del proyecto originalmente propuesto. Estas, más bien, suponen modificaciones al concepto original y no se apartan de la obra originalmente concebida, para la cual se realizaron vistas públicas y las agencias pertinentes brindaron sus recomendaciones. Por el contrario, las modificaciones propuestas optimizan el uso eficiente de la tierra en consonancia con la política pública de "lograr el uso intensivo de los terrenos en las áreas urbanas". (Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico, Metas Generales Sobre el Uso de los Terrenos, supra). Le brindamos deferencia a las determinaciones de la Junta en el sentido de que las *976 modificaciones al proyecto no alteran las recomendaciones de la Junta de Calidad Ambiental (Conclusión de Hecho Núm. 10), y de que la "modificación no es significativa deforma tal que no altera el concepto de, usos de terrenos propuestos y la misma satisface las disposiciones reglamentarias y de política pública aplicables"-[Conclusión de Derecho 2 (h)].
El cuarto error no fue cometido.
VII
Como quinto señalamiento de error que exponen los interventores-recurrentes, es que erró la Junta al autorizar un proyecto que alegadamente no cumplió con el requisito de notificación de vista pública a los vecinos de las propiedades en un radio de 100 metros, según dispone el Reglamento de Zonificación y el caso Montoto v. Lorié, supra.
El Reglamento de Procedimientos Adjudicativos dispone, en su Sección 8, que la Junta notificará por escrito a todas las partes o a sus representantes autorizados e interventores, la fecha, hora y lugar en que. se celebrará la vista adjudicativa. La notificación será por correo o personalmente con no menos de 15 días de anticipación a la fecha de la vista. Por otro lado, la Sección 3.9 de la Ley de Procedimiento Administrativo Uniforme, (L.P.A.U.), Ley núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. see. 2159, dispone que la agencia notificará por escrito a todas las partes o a sus representantes autorizados e interventores la fecha, hora y lugar en que se celebrará la vista adjudicativa. Esto tendrá que hacerse al menos 15 días antes de la celebración de la vista. De lo anterior se desprende que la Junta tiene la obligación de notificar la fecha en que habrá de celebrarse la vista adjudicativa, no obstante, su caracterización, pública o administrativa, a todas las partes identificadas previamente que tengan interés particular en la adjudicación de la controversia. Misión Industrial v. Junta, supra, a la pág. 1164.
Por otro lado, el Reglamento de Zonificación, en su Sección 97.03 sobre la consulta de ubicación para proyectos comerciales extensos, requiere la celebración de vista pública con notificación a los dueños de las propiedades en un radio de cien metros del área en que se propone el proyecto. Por tal razón, se requiere la publicación de un aviso de vista pública en un rotativo de circulación general, además de la notificación a los propietarios dentro de la distancia antes mencionada.
Nos señala la Junta de Planificación que como parte de la tramitación de casos, al amparo de la Sección 97.03, ésta requiere a la parte proponente que le provea un listado de los nombres de los propietarios dentro de un radio de 100 metros, de la propiedad objeto de consulta. (Moción de Desestimación y/o en Oposición a que se expida el Recurso de Revisión, págs 18-19). A tales efectos, la Junta emitió una Resolución, el 11 de mayo de 1998, en la que dejó en suspenso la vista hasta que se le sometiera, entre otras, la siguiente información:

“1. Lista de direcciones postales de:

Todos los dueños de propiedades que radican dentro de una distancia de 100 metros, medidos desde todos los límites del solar o parcela objeto de la consulta, hasta los límites de cualquier solar o parcela que radique dentro de la distancia antes indicada.

Si dentro de la distancia de 100 metros, indicada en el apartado (a) propiedades, deberá ampliar la distancia de 100 metros, en todas las direcciones, hasta incluir un mínimo de 20 propiedades. No obstante, deberá incluir todas las propiedades que existan dentro de la distancia antes determinada.

2. Identificar, en un plano, las propiedades incluidas en el listado con el número correspondiente al mismo y marcar la distancia de cien metros o la distancia ampliada determinada.

3. Certificar que las direcciones postales que se indican en el listado, son correctas. ”

*977 Luego de sometida la información, la Junta procedió a enviar las cartas de notificación correspondientes. [Resolución del 8 de marzo de 1999, Conclusiones de Derecho, 2 (f) (4)]. Dieciséis de las cartas fueron devueltas por el correo, por lo que la Junta procedió a entregárselas al proponente para que éste las entregara personalmente. El aviso de prensa, por su parte, se publicó el 18 de julio de 1998 en el periódico El Vocero, anunciando que la vista pública se llevaría a cabo el 17 de agosto de 1998.
Según se desprende de una declaración jurada firmada por el proponente, el 13 de enero de 1999, éste procedió a hacer las gestiones pertinentes para entregar a sus destinatarios las cartas devueltas. Logró entregar personalmente trece (13) de ellas. El intento de entregar las tres (3) cartas restantes, resultó infructuoso.
El 7 de marzo de 1999, el proponente envió una carta a la Junta de Planificación, explicando porqué varias cartas fueron devueltas. Entre las razones para la devolución, señaló que el Centro de Recaudación e Ingresos Municipales (C.R.I.M.) había brindado algunas direcciones erróneas; en otros casos, la información dada por el C.R.I.M. fue errónea y sustituida por una real; en ocho de los casos, las direcciones correspondían a la Urbanización Reparto Gómez y no a Quintas de Humacao como se pensaba (dichas urbanizaciones colindan una al lado de la otra sin distinciones de rótulos o verjas) (Anejo II del proponente recurrido.)
Según surge de las cartas devueltas por el correo, las mismas tienen fecha del 21 de julio de 1998 y dos sellos ponchados en la Junta. Uno de los sellos lee: "Recibido en el correo de Planificación, 28 de julio de 1998" y el otro lee: "Radicado Oficina del Secretario 29 de julio de 1998".
La interventora recurrente no ha alegado, ni demostrado, que las cartas enviadas originalmente, no se hayan enviado con antelación a los quince días de celebrarse la vista pública. Sólo cuestiona que no se sabe en qué fecha las cartas devueltas fueron entregadas. A esos efectos, no nos ha presentado prueba indicativa de que tales cartas fueron entregadas en una fecha posterior a la celebración de la vista, o de que alguno de los propietarios dentro de los 100 metros del área, no recibió la notificación en el tiempo requerido.
A raíz de ello, no podemos variar la determinación de la Junta en el sentido de que "la parte proponente publicó el aviso de prensa correspondiente dentro del término legal establecido. A su vez notificó mediante correo certificado a los dueños de las propiedades en un radio de 100 metros de predio objeto de consulta, conforme surge del C.R.I.M Asimismo, el proponente hizo las gestiones necesarias para notificar personalmente las cartas devueltas. En este caso se cumplió con el aviso de prensa requerido y se notificó a los vecinos por correo certificado. También se notificó personalmente [a] aquéllas personas cuyas cartas fueron devueltas por el correo". [Conclusión de Derecho Núm. 2 (f) (4)].
En cuanto a las tres cartas que no se pudieron entregar personalmente, entendemos que la peticionaria hizo las gestiones necesarias para su entrega, además de que se publicó un aviso de prensa dentro del término reglamentario que sirvió para dar notificación de la vista pública.
La interventora-recurrente argumenta que la Junta erró al no cumplir con los requisitos de notificación de vista pública, según dispone el Reglamento de Planificación Número 4 y el caso Montoto Pratts, supra. Cabe señalar que el caso de Montoto Pratts trata sobre el proceso de rezonificación, el cual es uno cuasi-legislativo. Contrario a los requistos de notificación de un desarrollo extenso, la Sección 4.06 del Reglamento de Zonificación (sobre requisitos de solicitud para cambios de zonificación), requiere la evidencia de haber notificado la intención de radicar la solicitud a los dueños de las propiedades más cercanas del área propuesta a rezonificarse. Para ello, el reglamento establece la fórmula a usarse para determinar quiénes son los propietarios a ser notificados. La evidencia de tales gestiones consiste en una declaración jurada y el acuse de recibo de la notificación. En la Sección 97.03 no se exigen estos requisitos.
Concluimos que no era necesario presentar una declaración jurada para certificar la notificación a los vecinos del área, máxime cuando lo que la Junta había requerido era una certificación de que las direcciones *978 sometidas eran las correctas. Lo importante es que la notificación se hizo antes de la vista pública.
Sobre el planteamiento de los interventores-recurrentes en el sentido de que en el día de la vista no constaban en el expediente de la Junta las cartas devueltas, y que ello constituye evidencia secreta considerada por la Junta, entendemos que no le asiste la razón. Tal y como argumenta la Junta, tales cartas no tienen información de los méritos del caso, además de que estaban disponibles en la oficina del técnico del caso. Con una simple solicitud de dichas cartas, se hubiese obtenido la información requerida. No creemos que este sea un error sustancial que de paso a la nulidad de la consulta de ubicación.
VIII
Los procedimientos y las decisiones de un organismo administrativo tienen a su favor una presunción de regularidad y corrección. Henríquez v. Consejo de Educación Superior, 120 D.P.R 194, 210 (1987). Tal presunción tendrá que ser respetada, mientras la parte que la impugne no produzca suficiente evidencia para derrotarla. Facultad para las Ciencias Sociales Aplicadas v. C.E.S.; Opinión de 2 de junio de 1993, 93 J.T.S. 88, pág. 10783; Catalytic Ind. Maint. v. F.S.E., 121 D.P.R. 98, 101,102 (1998). Así, si la decisión impugnada está sostenida por evidencia sustancial, que "es aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión", Hilton Hotel v. Junta de Salario Mínimo, 74 D.P.R. 670, 687 (1954), la misma debe ser confirmada.
Reiteradamente, se ha resuelto que los tribunales apelativos han de conceder gran deferencia y consideración a las decisiones administrativas, en vista de la gran experiencia y conocimiento especializado de las agencias. Torres v. Star Kist Caribe Inc., Opinión de 28 de enero de 1994, 94 J.T.S. 5, pág. 11458. Es por ello que la revisión judicial está limitada a determinar si la actuación administrativa fue razonable y cónsona con el propósito legislativo o si, por el contrario, fue irrazonable, ilegal o medió abuso de discreción. Rivera Rentas v. A&C Development, Opinión de 26 de noviembre de 1997, 97 J.T.S. 143, pág. 344; Quiñones Irizarry v. San Rafael Estates, S.E., Opinión de 30 de junio de 1997, 97 J.T.S. 109, pág. 1329; Agosto v. Fondo del Seguro del Estado, 132 D.P.R. 866, 879 (1993); Fuertes y otros v. ARPE, Opinión de 17 de septiembre de 1993, 93 J.T.S. 165, pág. 11385; Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692, 699.
La Ley de Procedimiento Administrativo Uniforme, en su Sección 4.5, supra, sec. 2175, dispone que las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obre en el expediente administrativo. De existir un conflicto razonable y auténtico en la prueba, el tribunal debe considerar como decisiva la determinación administrativa. Será concluyente aquélla que tenga una base racional. Hilton Hotels, supra. Con la adopción de esta regla, se pretende evitar que, mediante la revisión judicial, se sustituya el criterio del organismo administrativo por el del tribunal revisor en materias especializadas. López v. Junta de Planificación, 80 D.P.R. 646, 673 (1958); Ledesma v. Tribunal de Distrito, 73 D.P.R. 396, 401 (1952).
La deferencia judicial en la revisión judicial de decisiones administrativas, no significa una renuncia, por parte de los tribunales, a la función revisora en casos apropiados meritorios. La actuación administrativa no es válida cuando se ha cometido un error en la aplicación de la ley. Fuertes y otros, supra. Además, las conclusiones de derecho de la agencia, distinto de las determinaciones de hechos, pueden ser revisadas en todos sus aspectos por el tribunal, sin sujeción a norma o criterio alguno. Esto no significa, sin embargo, que al ejercer su función revisora, el Tribunal pueda descartar libremente las conclusiones e interpretaciones de la agencia, sustituyendo el criterio de ésta por el propio. Misión Industrial de Puerto Rico, supra, pág. 1160. Aún así! cuando la interpretación que del estatuto hace la agencia produce resultados inconsistentes con el propósito de la ley o afecta sustancialmente derechos fundamentales, esta no puede prevalecer. Associated Insurance Agencies, Inc. v. Comisionado de Seguros de Puerto Rico, Opinión de 26 de noviembre de 1997, 97 J.T.S 142 pág. 332.
En resumen, la revisión judicial, en materia de decüiones administrativas, consiste en resolver si existe una *979 base racional apoyada por evidencia sustancial que sostenga la decisión impugnada. Cuando la totalidad del expediente administrativo sostiene las decisiones adoptadas por la agencia, y la interpretación de sus guías, reglas o reglamentos es razonable y compatible con el propósito de la ley, los tribunales no deben sustituirlos por su propio criterio.
Aplicada esa normativa a este caso, y por las razones antes explicadas, declinamos la invitación de la parte recurrente a intervenir con la discreción de la Junta.
IX
Por las razones expuestas, se deniega la expedición del auto de revisión solicitado.
Lo acordó y ordena el Tribunal, y lo certifica la Subsecretaría General.
Gladys E. Ortega Ramírez
Subsecretaría General